[S. F. No. 17855. In Bank. Aug. 1, 1949.]

ANNA M. PHYLE, Appellant, v. CLINTON T. DUFFY, as Warden of the State Prison, etc., Respondent.

Morris Lavine for Appellant.

Fred N. Howser, Attorney General, and Clarence A. Linn, Deputy Attorney General, for Respondent.

EDMONDS, J.—William Jerome Phyle's conviction of murder and sentence to death was reviewed and affirmed upon appeal. (*People* v. *Phyle,* 28 Cal.2d 671 [171 P.2d 428].) In December, 1946, two days prior to the time set for his execution, the warden of San Quentin Prison, as authorized by section 3701 of the Penal Code, stated to the District Attorney of Marin County that there was "good reason to believe" Phyle was insane. In a proceeding to determine that question, a jury adjudged Phyle to be insane, and he was committed to the state hospital. Less than one month later, the superintendent of the hospital certified to the Governor that Phyle had recovered his sanity. He was returned to prison and the execution was set for the following May.

Shortly before that time, a petition for a writ of habeas corpus was filed with this court. The writ issued and the execution was stayed. Subsequently the writ was dismissed and Phyle was remanded to custody for the execution of the sentence of death. (30 Cal.2d 838 [186 P.2d 134].) A petition for rehearing was filed, and denied. March, 1948, was then fixed for execution. Again, a new legal proceeding was commenced and Phyle's petition to the United States Supreme Court for certiorari and stay of execution was granted. Upon the further consideration of the matter, the writ of certiorari was dismissed. (334 U.S. 431 [68 S.Ct. 1131, 92 L.Ed. 1494].)

A third date, September, 1948, was then fixed for the execution of Phyle, but a few days before that time, Phyle's mother, on his behalf, filed in the superior court a petition for a writ of mandate to compel the warden to institute a proceeding

for the determination of his sanity by a jury in accordance with the provisions of section 3701 of the Penal Code. An alternative writ was issued and a stay of execution granted. Upon a trial, the court found that there was no reason to believe Phyle was insane. The alternative writ was discharged, and the stay of execution was vacated.

The present appeal is from that judgment. Prior to the filing of any briefs, the attorney general moved for the following relief in the alternative: (1) To dismiss the appeal as frivolous and taken solely for delay; (2) To affirm the judgment; (3) To advance the cause on the calendar and submit the same for decision; or (4) For such other relief as may be proper. Following the argument upon the motion, the appeal was advanced for hearing on the merits.

█ As grounds for reversal of the judgment, Phyle asserts: (1) that since he was declared insane by the verdict of a jury, he is presumed to be insane until a jury finds to the contrary; (2) section 3704, if constitutionally construed, gives him a right to a trial by jury on that question; (3) the failure to grant a jury trial in the present proceeding was a violation of due process under the Federal Constitution; (4) any procedure denying a full judicial hearing, as provided by the laws of the State of California is a denial of due process under the guarantee of the Federal Constitution; and (5) section 3704 of the Penal Code is constitutional only if construed as requiring a trial by jury upon the issue of restoration to sanity. In substance, Phyle's position is that both under California law and the requirements of federal due process, he is entitled to a trial by jury to determine whether he has been restored to sanity.

After section 3704 of the Penal Code was construed by this court adversely to Phyle in the habeas corpus proceeding (*In re Phyle*, 30 Cal.2d 838 [186 P.2d 134]), the Supreme Court of the United States granted a writ of certiorari "because of the serious nature of the due process contentions presented in the petition." The questions presented, as stated by the court, were "that execution of an insane man is offensive to the fundamental principles of life and justice which lie at the base of all our civil and political institutions. *Adamson* v. *California*, 322 U.S. 46 [67 S.Ct. 1672, 91 L.Ed. 1903, 171 A.L.R. 1223], *Carter* v. *Illinois*, 329 U.S. 173 [67 S.Ct. 216, 91 L.Ed. 172], and . . . that life shall not be taken by the state as the result of the unreviewable ex parte determina-

tion of a crucial fact made by a single executive officer. See *Ng Fung Ho* v. *White*, 259 U.S. 276 [42 S.Ct. 492, 66 L.Ed. 938]." But the jurisdiction to determine these issues was expressly limited as follows: "It is not appropriate for us to pass on such constitutional questions in this habeas corpus case if, as the California attorney general contends, there is a state remedy by mandamus available to petitioner under which he can invoke judicial action to compel the warden to initiate judicial proceedings, and in which mandamus proceedings the court will hear and consider evidence to determine whether there is 'reason to believe' that the petitioner is insane."

After an analysis of the California statutes and decisions, the writ of certiorari was dismissed with a reference to *In re Phyle, supra,* which it was said, held "that neither habeas corpus nor any other remedy is available to test sanity of a condemned defendant, except the remedy under section 3701 which only the warden can institute. Hence, so far as here appears, mandamus to compel action by the warden is the only available remedy." And the court concluded: "We cannot say at this time that California's remedy by mandamus will be less than a substantial equivalent of one which authorized him to apply directly to a court for full hearing . . . [and] in this situation we find no federal constitutional question presented which is ripe for decision here." Mr. Justice Frankfurter's concurring opinion likewise viewed the situation as one of local procedure: "The Court now finds that all that the California Supreme Court did was to hold that as a matter of California procedure the petitioner's claim could not be passed on by the direct remedy of habeas corpus, but that there is available a special local remedy, labeled mandamus, *whereby the petitioner can judicially test his present sanity.*" (Emphasis added.) Otherwise stated, certiorari was granted because Phyle claimed he was to be executed after a determination as to his sanity by a hospital superintendent with no further proceeding open to him, and the court dismissed the writ when it appeared that there is a way whereby one in his position may continue to press the right to prove present insanity and obtain a judicial determination of the question.

As indicated in the opinion of Mr. Justice Frankfurter, it is clear that the claim which must be subject to judicial review is "present sanity"; it is presently that Phyle is to

be executed, and it is only his threatened execution which could compel a judicial hearing.

However, Phyle's counsel insists that the Supreme Court, by its opinion, has directed this court to review the determination by the hospital superintendent, which was the question decided in the habeas corpus appeal. The argument wholly ignores the issues here involved. In neither opinion in the Supreme Court is there any holding or implication that Phyle is entitled to a trial by jury as a matter of right for the purpose of reviewing the finding of the hospital superintendent concerning restoration to sanity. In the case of *In re Phyle*, 30 Cal.2d 838 [186 P.2d 134], this court determined that the law of California does not give one a right to such a review, and the United States Supreme Court, in analyzing its decision in *Nobles* v. *Georgia*, 168 U.S. 398 [18 S.Ct. 87, 42 L.Ed. 515], rejected the argument that there is a right to a trial by jury under such circumstances. It said: "A condemned defendant cannot automatically block execution by suggestions of insanity, and . . . a state tribunal, particularly a judge, must be left free to exercise a reasonable discretion in determining whether the facts warrant a full inquiry and hearing upon the sanity of a person sentenced to death."

Assuming, therefore, that due process of law requires a judicial hearing upon the issue of present sanity of a person condemned to execution, this proceeding in mandate accords Phyle such hearing. By it, he has been given a judicial determination upon the only issue he could properly raise, and it is significant that the judgment is not challenged upon the ground of the insufficiency of the evidence to support it.

In addition to the points presented in the brief, at the oral argument counsel for Phyle argued that the law of California requires a trial by jury in a proceeding brought to compel the warden to initiate a hearing on the issue of a prisoner's sanity in accordance with the provisions of section 3701 of the Penal Code. Section 7 of article I of the California Constitution provides: "The right to trial by jury shall be secured to all, and remain inviolate." That right, however, is only such as existed at common law. (*Pomeroy* v. *Collins*, 198 Cal. 46 [243 P. 657]; *People* v. *Powell*, 87 Cal. 348 [25 P. 481, 11 L.R.A. 75]; *People* v. *Bruneman*, 4 Cal.App.2d 75 [40 P.2d 891]; *Estate of Escover*, 108 Cal.App. 697 [292 P. 167]; *Gregory* v. *Hecke*, 73 Cal.App. 268 [238 P. 787].) It has always been held in this state that the right of jury

trial does not extend to special proceedings (*Vallejo etc. R.R. Co.* v. *Reed Orchard Co.*, 169 Cal. 545 [147 P. 238]), and mandate, being a special proceeding, is not subject to the constitutional requirement (*Hutchison* v. *Reclamation District No. 1619*, 81 Cal.App. 427 [254 P. 606]), although the Legislature has provided that, where the answer raises a question of fact as to an essential matter, "the court may, in its discretion, order the question to be tried before a jury." (Code Civ. Proc., § 1090.)

In the present case, Phyle did not request the court to submit any issue raised by the petition to a jury, nor, had such request been made, would it have compelled an affirmative ruling because a trial by jury of issues of fact in a mandate proceeding is wholly within the sound discretion of the trial judge. Instead of making such a request, Phyle's counsel placed themselves in the rather anomalous position of petitioning for a writ of mandate and then demanding that the writ issue as a matter of right without offering any evidence whatever.

At the outset of the trial, counsel for Phyle said, "I might state our position. I do not wish to offer any evidence at this time. I do not think it is the proper time to offer evidence." After a discussion of the opinion in the prior proceedings brought by Phyle, the trial judge asked: "Are you going to submit any evidence or is this argument? As I understand it at the present time on this petition for mandate, all you are asking is that the Warden of the State Prison certify that he believes the defendant to be insane." Following counsel's affirmative reply, the court continued: "Therefore, as . . . he has refused to certify, we can take evidence to determine whether or not there is reasonable ground for the Warden's opinion, that is as far as this writ is concerned. If you wish to present evidence, you may." This offer was declined by counsel who stated: "I don't believe any evidence is necessary your honor."

But the attorney general insisted upon the presentation of evidence. He said: "If your Honor please, because of the gravity of the matter, before I would be willing to close the book on it, I would want the Warden to take the stand and have him give the reasons that impel him to the conclusion that he has reached." Counsel for Phyle again stated his position that the issue before the court for decision was one of law: "I think what is before this Court [apparently refer-

ring to the prior judgment declaring Phyle insane which was mentioned but never offered in evidence] is res adjudicata as to the question of insanity—certainly at that time." It is clear, therefore, that counsel was acting on the assumption that by this proceeding in mandate, the question as to Phyle's insanity as of December, 1945, and January, 1946, was being opened up, and throughout the entire mandate proceedings, he refused to meet the issue of *present* sanity as the subject of inquiry.

Although there was no evidence offered by Phyle to support the petition for the writ, the court heard witnesses called by the attorney general and cross-examined by counsel for petitioner. Finally, two witnesses testified for Phyle. Therefore, notwithstanding the theory followed by petitioner's counsel, a full and fair hearing was held upon the issue of Phyle's sanity at that time.

The record has been examined and discloses that the findings of the trial court are fully supported by the evidence. Warden Duffy appeared as a witness and testified that he had visited Phyle on a number of occasions; it was his opinion that Phyle was presently sane, and there was no reason he knew of to believe that Phyle was insane. This conclusion, he stated, he reached upon the basis not only of his personal observation, but also from reports from six different psychiatrists, all of whom had examined Phyle and found him sane.

Two of these six psychiatrists were called as expert witnesses by respondent, and each testified that, in his opinion, Phyle was sane. They both reported that Phyle knew he was in San Quentin convicted of the murder of Frazee, knew he was under judgment of death, knew that his execution had been stayed by the mandate proceeding, was conversant with the facts of his original trial, and was not suffering from any hallucinations or delusions.

One of these experts was Dr. Walter Rappaport, the hospital superintendent who issued the certificate of restoration to sanity after the judgment entered upon the verdict of a jury to the contrary. Upon cross-examination, Dr. Rappaport explained that shortly after Phyle's commitment to the hospital, he "told me very frankly he had faked the whole thing and he was surprised that Dr. Schmidt [the prison psychiatrist] was fooled but not surprised that he fooled the warden. . . . He said other prisoners conducted examinations and that naturally if they are friendly and want to help you they would

indicate to you what you should say and what the answer should be. He was very frank."

At this point, counsel for petitioner called Dr. David G. Schmidt, the prison psychiatrist, who testified that, although at one time he had been convinced that Phyle was insane, he was presently certain of Phyle's sanity. This testimony was unshaken in spite of severe cross-examination.

Mrs. Anna Phyle, the petitioner and mother of Phyle, then testified. The most direct testimony she gave was that, after his return from the war, her son acted queerly and she "couldn't figure him out . . . he was almost violent [and she] was really afraid of him." She then stated that "he was improved some but *when he left and committed this crime*, he was not in his right mind, he was mentally sick." (Emphasis added.) Such testimony falls far short of a compelling reason for a conclusion of *present* insanity.

The record, therefore, fully supports the determination that the warden "does not have, nor is there any good reason to believe that said William Jerome Phyle has become insane or is presently insane." In such circumstances, the trial judge could not have done other than discharge the alternative writ. Whatever may have been Phyle's mental condition at other times, the legislative concern expressed in section 1367 of the Penal Code is that the state shall not execute a person who is insane. The United States Supreme Court indicated that the due process clause of the Fourteenth Amendment requires a hearing upon that question when it is properly presented for consideration. Phyle was afforded the opportunity to "judicially test his present sanity" and no legal ground has been shown for disturbing the finding adverse to him.

In order that there be no misunderstanding as to the scope of this holding (see *Young* v. *Ragen*, 334 U.S. 810 [68 S.Ct. 1013, 92 L.Ed. 1742], following *Loftus* v. *Illinois*, 334 U.S. 804 [68 S.Ct. 1212, 92 L.Ed. 1737]), the law of California, as it has heretofore been stated, is as follows: The case of *In re Phyle*, 30 Cal.2d 838 [186 P.2d 134], held that "there is no authority . . . for the proposition that [a condemned] defendant has a right to habeas corpus or other judicial proceeding to determine the question of his sanity after his release from the state hospital." The United States Supreme Court granted certiorari, but later dismissed the writ upon procedural grounds intimating that due process of law requires some sort of judicial hearing upon the issue of the

present sanity of a person under sentence of death. (*Phyle* v. *Duffy*, 334 U.S. 431 [68 S.Ct. 1131, 92 L.Ed. 1494].) Because of the insistence of the attorney general that mandate is an available remedy, the court found "no federal constitutional question ripe for decision." Otherwise stated, until Phyle is finally and unequivocally denied a judicial hearing in any form, a determination as to whether there is a constitutional right to such a hearing would be premature.

After that case was decided, the claim of insanity made on behalf of one Eggers, then under sentence of death, came to this court by an appeal from a denial of a writ of mandate by the trial court. The remedy of mandate was utilized to compel the warden to bring Eggers before a jury for a determination as to his sanity under the procedure specified by section 3701 of the Penal Code. The judgment denying the writ was affirmed (*Williams* v. *Duffy*, 32 Cal.2d 578 [197 P.2d 341]) but without any express determination that mandate is an available remedy. Certain statements made in deciding *Phyle* v. *Duffy*, 334 U.S. 431 [68 S.Ct. 1131, 92 L.Ed. 1494], seemed to indicate that there was some question as to the soundness of the conclusion of this court in the first Phyle case (*In re Phyle*, 30 Cal.2d 838 [186 P.2d 134]). Because of this uncertain situation, this court, in deciding *Williams* v. *Duffy*, *supra*, assumed the necessity of the remedy and concluded, upon the merits, that the evidence was insufficient to show any good reason to believe Eggers was insane. The decision in the present case has the same basis, for the record includes no evidence tending to show any reasonable foundation for a belief that Phyle is insane.

If, therefore, it is assumed that due process of law requires a judicial inquiry concerning the issue as to sanity, necessarily the conclusion reached in the decision of *In re Phyle*, *supra*, is incorrect, and the question for determination here would concern the remedy or remedies available to a person in Phyle's position. In turn, the particular relief sought by Phyle would be the decisive factor.

The normal method of reviewing the legality of a prisoner's detention is by writ of habeas corpus. (Pen. Code, § 1473; *In re Bell*, 19 Cal.2d 488 [122 P.2d 22]; 13 Cal.Jur. 216; cf. *Loftus* v. *Illinois*, 334 U.S. 804 [68 S.Ct. 1212, 92 L.Ed. 1737]), and where habeas corpus is available and adequate it is the exclusive remedy and mandate will be denied. (*Irvine* v. *Gibson*, 19 Cal.2d 14 [118 P.2d 812]; *Ross* v. *O'Brien*, 1 Cal.App. 2d 496 [36 P.2d 1108].) Certainly, in the absence

of a particular statutory remedy, the procedure of habeas corpus would satisfy any assumed requirement of judicial hearing upon the issue of the present sanity of a condemned prisoner.

However, section 3701 of the Penal Code provides that where there is good reason to believe a condemned prisoner is insane the warden *must* institute a proceeding directed to obtaining a *jury trial* of the issue of his sanity. Due process does not require such a trial. (*Phyle* v. *Duffy,* 334 U.S. 431 [68 S.Ct. 1131, 92 L.Ed. 1494]; *Nobles* v. *Georgia,* 168 U.S. 398 [18 S.Ct. 87, 42 L.Ed. 515].) Its basis is entirely statutory, and the determination by a jury may be obtained only when the proceeding is instituted by the warden. Mandate is the proper remedy to compel a public officer to perform an official duty, and it may be had not only upon a failure to exercise a duty but also where the officer's refusal to do so constitutes an abuse of discretion. (*McClatchy Newspapers* v. *Superior Court,* 26 Cal.2d 386, 394 [159 P.2d 944].)

Where a prisoner seeks to invoke the statutory remedy provided by section 3701 of the Penal Code, mandate is the only available proceeding. Thus, upon the assumption that any judicial hearing as to sanity must be afforded one under sentence of death, there are two remedies, each directed to an exclusive form of relief. To acquire a simple judicial determination of the fact of sanity, habeas corpus is the proper and exclusive remedy. But to obtain a jury trial of that issue, as provided by section 3701 of the Penal Code, mandate is the only available and adequate remedy. As stated by Mr. Justice Black: "In view of this mandatory obligation [under Pen. Code, § 3701] upon the warden to initiate proceedings if 'there is good reason to believe' a defendant sentenced to death is insane, it would be somewhat anomalous, to say the least, if California courts were wholly without power to correct an executive agent's abuse of authority in a matter of such significance as the execution of insane persons." (*Phyle* v. *Duffy,* 334 U.S. 431 [68 S.Ct. 1131, 1135-36, 92 L.Ed. 1494].)

Throughout the habeas corpus proceedings and the one now under review, Phyle has sought only a *jury trial.* To obtain such relief, his proper remedy, if any is available, is the proceeding for mandate here under review. But upon the application for the writ itself he is not entitled to a trial by jury; only when he has obtained the writ may he have such a trial, and having failed to show any "good reason" why

the warden should initiate an inquiry, the judgment denying the remedy allowed by section 3701 of the Penal Code must be affirmed.

It is so ordered.

Gibson, C. J., and Shenk, J., concurred.

TRAYNOR, J.—I concur in the judgment.

Petitioner contends that under the decision of the United States Supreme Court in *Phyle* v. *Duffy*, 334 U.S. 431 [68 S.Ct. 1131, 92 L.Ed. 1494], he is entitled to the judicial hearing that this court has denied him.

Neither that decision nor any provision of the United States Constitution gives petitioner the right to an initial judicial determination of his restoration to sanity or to a judicial review of an administrative determination thereof. The statutes of this state, as construed in *In re Phyle,* 30 Cal.2d 838 [186 P.2d 134], preclude both a judicial hearing and judicial review. This court there held that in Penal Code, sections 3700-3704, the Legislature has prescribed the exclusive method by which the sanity or the restoration to sanity of one condemned to death who subsequently becomes insane may be determined. Penal Code, section 3704, provides that '' [w]hen the defendant recovers his reason, the superintendent of such hospital must certify that fact to the Governor, who must thereupon issue to the warden his warrant appointing a day for the execution of the judgment. . . .'' The court held that the determination by the hospital superintendent prescribed by the statute was not subject to judicial review by habeas corpus or otherwise. It invoked the provision of Penal Code, section 3700, that ''No judge, court, or officer, other than the Governor, can suspend the execution of a judgment of death, except the warden of the State prison to whom he is delivered for execution . . . unless an appeal is taken.'' Petitioner's appeal had previously been determined (28 Cal.2d 671 [171 P.2d 428]) and his conviction had become final. A judicial review of the hospital superintendent's determination would compel suspension of the execution of the judgment, contrary to the express terms of section 3700.

*Gardner* v. *Jones,* 126 Cal. 614 [59 P. 126], and *In re Buchanan,* 129 Cal. 330 [61 P. 1120, 50 L.R.A. 378], are not applicable here. Those cases determined that a person held in a state hospital as insane could properly bring habeas corpus to compel the superintendent to release him as cured;

habeas corpus always lies at the petition of one unlawfully restrained of his liberty. (Pen. Code, § 1473.) They are not authority for the converse proposition that a person found sane and released from a hospital may maintain an action of habeas corpus to prove himself insane and thus gain re-admission to the hospital. Petitioner was released from the state hospital because he was found sane. He would have gone free had he not been detained by respondent by virtue of a final judgment of a court of competent jurisdiction. (Pen. Code, § 1486[2].) He would have gone free had he not been convicted of murder, and there can be no doubt that he could not invoke habeas corpus to return to the hospital. He cannot invoke it now to escape the execution of the judgment. The intervention of the judgment has no bearing on the question of his sanity; it does not give him a right to habeas corpus to get back into the hospital that he otherwise would not have.

Petitioner contended that the California procedure as thus interpreted would deprive him of his life without due process of law, and on that ground he petitioned the United States Supreme Court for a writ of certiorari. The court granted the petition to determine whether there was any merit in this contention. (333 U.S. 841 [68 St.Ct. 656, 92 L.Ed. 1125].) In granting certiorari, the court did not decide, as petitioner concludes, that the Fourteenth Amendment would be violated by a conclusive administrative adjudication that his sanity had been restored. It agreed merely to consider the question, but found it unnecessary to decide it because of the deputy attorney general's statement that under California procedure a judicial remedy was available to petitioner. Mr. Justice Black, speaking for the majority, stated: "It is not appropriate for us to pass on such constitutional questions in this habeas corpus case if . . . there is a state remedy by mandamus available to petitioner under which he can invoke judicial action to compel the warden to initiate judicial proceedings, and in which mandamus proceedings the court will hear and consider evidence to determine whether there is 'reason to believe' that the petitioner is insane." (*Phyle* v. *Duffy*, 334 U.S. 431 [68 S.Ct. 1131, 1135, 92 L.Ed. 1494].)

This court, however, did not limit itself in *In re Phyle, supra*, to holding that habeas corpus was not the proper remedy, or even to holding that there could be no judicial review of the superintendent's determination. It held unequivocally that there could be no judicial review under Cali-

fornia procedure and that petitioner's right to a judicial hearing depended solely upon whether the warden believed that he was insane. (30 Cal.2d 838, 847 [186 P.2d 134].) The reasons for holding that there can be no judicial review of the superintendent's determination likewise preclude issuance of mandamus to compel action by the warden. The decision of this court in *Williams* v. *Duffy,* 32 Cal.2d 578 [197 P.2d 341], does not compel a contrary conclusion. In that case the court, proceeding on the assumption that mandamus was a proper remedy, held only that the petitioner therein did not present a sufficient case for the issuance of a peremptory writ. Penal Code, section 3700, precludes the suspension of the execution of the judgment by mandamus just as it precludes its suspension by habeas corpus. This statute prohibits any judicial intervention unless initiated by the warden of the state prison. In the absence of a holding by the United States Supreme Court that this statute is unconstitutional, I do not believe that this court should countenance the use of mandamus to defeat its clearly stated purpose.

It bears emphasis that section 3700 presupposes a valid judgment of death after a trial that has met all the requirements of due process of law. Then and only then is it operative; it would not be constitutional otherwise. It does not preclude attack upon the judgment itself by habeas corpus, *coram nobis,* or any other appropriate proceeding. In the present case there is no question of the validity of the judgment.

Petitioner contends that the procedure the Legislature has prescribed for determining his restoration to sanity would deprive him of his life without due process of law. Petitioner is to be deprived of his life, not because an administrative officer has found him sane, but because a jury has duly found him guilty of murder in the first degree. Petitioner does not claim to have been insane at the time he committed the offense or unable to assist in his own defense because of insanity at the time of trial. He relies on the accidental intervention of insanity after trial and conviction as a basis for a right under the Fourteenth Amendment to have the execution of the judgment suspended pending a formal judicial determination. He contends that this right is so extensive that the state is powerless to leave the final determination of his sanity to an administrative officer.

Taking refuge in insanity as a means of escaping execution is not a constitutional right, but a privilege that the state has

conferred as an act of mercy or special dispensation. As the United States Supreme Court stated in *Nobles* v. *Georgia,* 168 U.S. 398, 407 [18 S.Ct. 87, 42 L.Ed. 515] : "The plea at this stage is only an appeal to the humanity of the court to postpone the punishment until recovery takes place, or as a merciful dispensation. The rights of the prisoner as an offender on trial for an offense are not involved. He has had the benefit of a jury trial, and it is now the court, only, which must be satisfied on the score of humanity." (Accord: *People* v. *Knott,* 122 Cal. 410 [55 P. 154] ; *Spann* v. *State,* 47 Ga. 549 ; *Davidson* v. *Commonwealth,* 174 Ky. 789 [192 S.W. 846] ; *Laros* v. *Commonwealth,* 84 Pa.St.200; *State ex rel. Alfani* v. *Superior Court,* 139 Wash. 125 [245 P. 929].) Recognizing that the suspension of execution on the ground of intervening insanity is a privilege granted by the state, and not a fundamental right of the defendant, at least 15 states* have dispensed with a formal judicial hearing upon the issue; others have provided merely for an informal inquiry that need satisfy only the trial judge of the defendant's sanity. Georgia, whose summary procedure was upheld in *Nobles* v. *Georgia, supra,* 168 U.S. 398, has repealed the statutes there questioned, and now provides no method by which the claim of intervening insanity may be raised. (*Cribb* v. *Parker,* 119 Ga. 298 [46 S.E.110].) Even in states in which the determination is made by the trial judge, the proceeding is not regarded as judicial in nature. "The appointment of the commission and the investigation made by them was not deemed or intended to be a trial in any sense of the word. It was simply, in our judgment, the proper exercise of a discretionary power." (*State* v. *Nordstrom,* 21 Wash. 403, 409 [58 P. 248].) It has been held proper for the state to make the decision of the initial arbiter final, expressly precluding any judicial review thereof. (*Webber* v. *Commonwealth,* 119 Pa.St. 223 [13 A. 427] ; *Darnell* v. *State,* (Tex.Cr.) 5 S.W. 522; *State* v. *Nordstrom,* 21 Wash. 403 [58 P. 248] ; see cases collected in 49 A.L.R. 804.)

There has been wide recognition of the value of delegating decisions of this kind to administrative experts. The British Criminal Lunatics Act, for example, provides (47 and 48 Vict., ch. 64) that a person ". . . ceases to be a criminal lunatic (1) if he is remitted to prison by a warrant of the Secretary

---

*Arizona, California, Idaho, Mississippi, Missouri, Montana, Nebraska, New Jersey, New York, North Dakota, Ohio, Oklahoma, Utah, Virginia, Wyoming.

of State issued upon a certificate from two medical practitioners that he is sane. . . ." (26 Halsbury's Laws of England 207.) The official draft of the proposed Code of Criminal Procedure of the American Law Institute makes provision (§§ 409-12) for a procedure similar to that established by the Penal Code. Section 412 of the American Law Institute Code provides for the commitment to an institution of a person under sentence of death who has been found to be insane. It then provides that "[I]f thereafter the proper officer of such institution is of the opinion that the defendant is sane he shall report this fact to the governor, whereupon the governor shall appoint a commission consisting of two competent disinterested physicians to determine whether the defendant has been restored to sanity. . . . If, after the report of the commission, the governor decides that the defendant has been restored to sanity, he shall cause the defendant to be returned to the custody of the —— (officer in charge of the prison to which the defendant has been committed) and shall issue a warrant to the —— directing him to execute the sentence at a time designated in such warrant." (Amer. Law Institute, Code of Criminal Procedure, § 412.) Under none of these provisions has it been deemed necessary or desirable that the defendant be accorded a judicial hearing or that his "right to insanity" be safeguarded against ex parte determination by appropriate administrative officials. (See, also, *People* v. *Sloper,* 198 Cal. 601 [246 P. 802]; *People* v. *Eldred,* 103 Colo. 334 [86 P.2d 248]; *Bingham* v. *State,* 82 Okla.Cr. 305 [169 P.2d 311]; *State* v. *Nordstrom,* 21 Wash. 403 [58 P. 248].)

The reason ordinarily advanced against executing a man who has become insane since judgment is that he might, if sane, recall something in stay of execution. (See 4 Blackstone, Commentaries (Jones ed.), p. 25.) Can this reason serve as a basis for a constitutional right not to be executed while insane? The possibility that a defendant, sane at the time of his trial, will recall some fact in stay of execution after a period of intervening insanity is remote. The reasoning that would establish a constitutional right to delay on this basis would also serve to postpone the execution of a sane man on the ground that a witness might conceivably be discovered thereafter whose testimony might save him. If the possibility of a subsequently refreshed memory were enough to prevent the execution of an insane man, it would also render unconstitutional any capital punishment, since it is possible to

speculate endlessly about the possibilities that would rescue a condemned man from execution provided it were delayed long enough.

Those who would delay capital punishment by questioning the finality of an administrative determination of sanity may in reality be concerned with the finality of capital punishment itself. Is it not an inverted humanitarianism that deplores as barbarous the capital punishment of those who have become insane after trial and conviction, but accepts the capital punishment of sane men, a curious reasoning that would free a man from capital punishment only if he is not in full possession of his senses?

Petitioner can claim at most a privilege, not a constitutional right. The Legislature has qualified this privilege by the condition that the administrative determination of sanity is not subject to judicial review; it has done so to prevent abuses of the privilege to secure delay. It is now contended, however, that the Legislature cannot thus qualify the privilege it has granted; that when the determination of the fact is a matter of life or death, it cannot be left to the ex parte unreviewable decision of an administrative officer.

The misleading implication is that petitioner is condemned by an administrative determination of his sanity. His life was forfeit when a jury found him guilty of first degree murder. His temporary release from punishment was a reprieve, not an absolution. His plea is now but to the mercy of the state.

The Legislature can properly leave to an administrative officer the final determination as to whether a condition exists that justifies extending a privilege. (*United States ex rel. Johnson* v. *Shaughnessy*, 336 U.S. 806 [69 S.Ct. 921, 93 L.Ed. ——] ; *St. Joseph Stockyards Co.* v. *United States*, 298 U.S. 38, 77 [56 S.Ct. 720, 80 L.Ed. 1033] ; *Dismuke* v. *United States*, 297 U.S. 167, 171-172 [56 S.Ct. 400, 80 L.Ed. 561] ; *Work* v. *Rives*, 267 U.S. 175, 182 [45 S.Ct. 252, 69 L.Ed. 561] ; *United States* v. *Babcock*, 250 U.S. 328, 331 [39 S.Ct. 464, 63 L.Ed. 1011] ; *United States* v. *Ju Toy*, 198 U.S. 253, 261-262 [25 S.Ct. 644, 49 L.Ed. 1040] ; *Carmichael* v. *Delaney*, 170 F.2d 239, 243-244; *United States ex rel. Medeiros* v. *Watkins*, 166 F.2d 897, 899; *United States ex rel. Lapides* v. *Watkins*, 165 F.2d 1017.) When there is merely a question of the regulation of a privilege, the validity of final administrative decisions under the due process clause does not require that notice or hearing be given. (*Oceanic Steam Nav. Co.* v. *Stranahan*,

214 U.S. 320-338 [29 S.Ct. 671, 53 L.Ed. 1013]; *Perkins* v. *Lukens Steel Co.*, 310 U.S. 113 [60 S.Ct. 869, 84 L.Ed. 1108]; *Origet* v. *Hedden*, 155 U.S. 228 [15 S.Ct. 92, 39 L.Ed. 130]; *Passavant & Co.* v. *United States*, 148 U.S. 214 [13 S.Ct. 572, 37 L.Ed. 426]; *Decatur* v. *Paulding*, 14 Pet. (U.S.) 497 [10 L.Ed. 559]; *United States* v. *Ju Toy*, 198 U.S. 253, 261-262 [25 S.Ct. 644, 49 L.Ed. 1040].)

The present case is analogous to those involving indeterminate sentence laws that give administrative agencies exclusive power to reduce the maximum sentences imposed by law. Upon conviction the defendant forfeits his liberty for the maximum term specified by statute. Thereafter the appropriate administrative body may reduce the sentence if it sees fit. These statutes, which allow the defendant's liberty to turn on the ex parte unreviewable decision of administrative officers, have been uniformly upheld on the ground that they violate no provision of the United States Constitution. (*Ughbanks* v. *Armstrong*, 208 U.S. 481 [28 S.Ct. 372, 52 L.Ed. 582]; *Dreyer* v. *Illinois*, 187 U.S. 71, 84 [23 S.Ct. 28, 47 L.Ed 79]; *United States* v. *Ragen*, 159 F.2d 356, cert. den. 331 U.S. 823 [67 S.Ct. 1311, 91 L.Ed. 1839]; *People* v. *Connors*, 291 Ill. 614 [126 N.E. 595], aff'd, 260 U.S. 695 [43 S.Ct. 11, 67 L.Ed. 468]; see also *In re Byrnes*, 32 Cal.2d 843, 850 [198 P.2d 685].) Otherwise it would be unconstitutional to give to the governor of the state the power to commute sentences. Here again the question of life or death turns on the unreviewable decision of a single nonjudicial officer; yet it has never been suggested that his decisions are subject to judicial review. Executive clemency is recognized as an act of mercy. Granting of the privilege of not being executed to one who is insane is likewise an act of mercy. Considerations may be presented to the governor for stay of execution or commutation of sentence that constitute much stronger grounds for mercy than intervening insanity; there may be strong doubts as to defendant's very guilt, or mitigating circumstances that do not warrant judicial intervention but carry a strong appeal to executive clemency. Yet the governor's determination is final even though it may be adverse to the petitioner. It follows that unless the Constitution itself prohibits the execution of a man who has become insane since judgment, the Legislature may well leave to the warden the final determination as to whether there is reason to believe he is insane.

The procedure provided by sections 3700-3704 of the Penal Code to determine when execution shall be stayed because of

defendant's intervening insanity is closely akin to that approved by the United States Supreme Court in *Nobles* v. *Georgia,* 168 U.S. 398 [18 S.Ct. 87, 42 L.Ed. 515]. Under that procedure also the determination of whether there was reason to believe defendant insane was left to the ex parte determination of a single state officer, and there was no hearing on the question. The court held that due process did not require the granting of a hearing on this issue when a state judge had determined after an ex parte examination of the defendant that there was no reason to believe that defendant was insane. It has been suggested that the Georgia procedure was sustained because a judge ruled on the question of fact. As at common law, the person given the discretionary authority was the trial judge, but it is clear, however, that he acted much in the manner of an administrative official or board. "It is rather a perversion of terms to call an inquisition of this kind the act of a court and to exercise in reference to it the writ of certiorari. The whole proceeding is rather an inquiry based on public propriety and decency, than a matter of right. . . ." (*Spann* v. *State,* 47 Ga. 549, 551. See, also, *Baughn* v. *State,* 100 Ga. 554 [28 S.E. 68, 38 L.R.A. 577], aff'd in *Nobles* v. *Georgia,* and *Carr* v. *State,* 98 Ga. 89 [27 S.E. 148], holding that under the law of Georgia the decision was not appealable.) It is settled, moreover, that the doctrine of separation of powers under the United States Constitution, which requires that certain issues of law or fact be decided by the judicial branch in the federal government, has no application to the states. (*Claiborne County* v. *Brooks,* 111 U.S. 400, 410 [48 S.Ct. 489, 28 L.Ed. 470] ; *Carfer* v. *Caldwell,* 200 U.S. 293, 297 [26 S.Ct. 264, 50 L.Ed. 488] ; *Consolidated Rendering Co.* v. *Vermont,* 207 U.S. 541, 552 [28 S.Ct. 178, 52 L.Ed. 327] ; *Reetz* v. *Michigan,* 188 U.S. 505, 507 [23 S.Ct. 390, 47 L.Ed. 563] ; *Dreyer* v. *Illinois,* 187 U.S. 71, 84 [23 S.Ct. 28, 47 L.Ed. 79].) There is nothing in the United States Constitution requiring states to delegate to one branch rather than another the decision on a question of fact. If due process requires notice and hearing, those requirements must be met whether the question is to be decided by a judge or an administrative officer. (*Honeyman* v. *Hanan,* 302 U.S. 375, 378 [58 S.Ct. 273, 82 L.Ed. 312] ; *Gelfert* v. *National City Bank of New York,* 313 U.S. 221, 235 [61 S.Ct. 898, 85 L.Ed. 1299, 133 A.L.R. 1467].) If due process does not require

notice and hearing, it is immaterial whether the ex parte determination is made by a judge or a nonjudicial officer of the government. Accordingly, the approval of the ex parte determination of a judge in the Nobles case by the United States Supreme Court would seem to be directed at the validity of the determination itself, not at the fact that it was made by a judge.

Petitioner had the benefit of independent determinations of his sanity by the hospital superintendent and by the warden. The Legislature is entitled to rely upon a presumption that these administrative and executive officers will act honestly and in good faith. There is no reason to believe that a judge could do more.

Petitioner contends, however, that since his insanity was initially determined by a jury in a judicial hearing, that adjudication gave him a vested right to be considered insane. He contends that either the judgment should continue in force or there should be proceedings in a court of competent jurisdiction to annul it or to supersede it with one of equal and later authority. This contention attributes to that adjudication a conclusiveness that it does not have. The judgment did not give petitioner a continuing status of insanity that can only be terminated after another judicial hearing. (*Kellogg* v. *Cochran,* 87 Cal. 192, 198 [25 P. 677, 12 L.R.A. 104]; *United States* v. *Halliday,* 116 F.2d 812; *In re Kassler,* 173 Misc. 856 [19 N.Y.S.2d 266]; *Sutton* v. *Sutton,* 222 N.C. 274 [22 S.E.2d 553]; *Bishop* v. *Bishop,* 40 Ohio App. 493 [179 N.E. 142].) The order of commitment stated only that the petitioner was then insane, and, pursuant to Penal Code, section 3704, provided expressly ''when said William Jerome Phyle recovers his reason, that the Superintendent of the State Hospital in which he is confined certify that fact to the Governor of the State of California for further proceedings as is required by law.'' The order by its terms recognizes that petitioner was to be confined in the hospital only until the superintendent certified that he had recovered his reason. When that certification is made, the order of commitment and the judgment of insanity no longer bar his recommitment to prison. When a statute such as section 3704 provides that the authorities of an institution shall discharge an inmate upon their determination that he is sane, such a discharge restores the person to a status of sanity. (*Kellogg* v. *Cochran,* 87 Cal. 192, 198 [25 P. 677, 12 L.R.A. 104]; *Shaw* v. *Feehan,* 207 Cal. 561 [279 P. 658]; *People ex rel. Guiseppi* v. *Thayer,*

242 N.Y.S. 293; *State ex rel. Connor* v. *Lamneck*, 133 Ohio St. 257 [13 N.E.2d 127] ; see Smoot, Law of Insanity, § 168, p. 128 and American Law Institute, Code of Criminal Procedure, § 412.) The hospital superintendent acted pursuant to the statute and the order of commitment; it cannot reasonably be held that this order precluded his making the determination it prescribed.

This court is here concerned, not with the wisdom of capital punishment or of the statutory procedure attendant upon it, but solely with the validity of that procedure. It may nevertheless be noted that there is sound reason underlying Penal Code, section 3700, so long as capital punishment is authorized in this state. If a defendant condemned to death under a valid judgment is allowed recourse to the courts as a matter of right upon his claim to be insane, he may secure an interminable reprieve merely by alleging that he is insane. Even after he is adjudged sane following hearing and appeal, he can allege that he has since become insane. Since the issue is his present insanity, he can thus set in motion an endless procession from trial to appeal to trial to appeal. Such procedure "would make the punishment of a defendant 'depend solely upon his fecundity in making suggestion after suggestion of insanity, to be followed by trial upon trial'." (*Phyle* v. *Duffy*, 334 U.S. 431 [68 S.Ct. 1131, 1134, 92 L.Ed. 1494].) If the warden's decision is subject to judicial review, the way is open for the endless series of trials and appeals that the Legislature sought to prevent by the enactment of section 3700.

Even if it is assumed that mandamus will lie to review the warden's determination, the peremptory writ was properly denied in this case. Petitioner was in fact, although erroneously, accorded a full judicial hearing on the question whether there was reason to believe that he was then insane. As the opinion of Mr. Justice Edmonds sets forth, not only was there ample evidence to support the judgment, but petitioner presented no evidence that might even serve as a basis for a contrary conclusion.

Spence, J., concurred.

SCHAUER, J., concurring and dissenting.—Now the error of this court in holding (*In re Phyle* (1947), 30 Cal.2d 838 [186 P.2d 134] ) that habeas corpus was not available as against the ruling of an administrative agent to test the sanity of a person under sentence of death, starts to multiply. Its progeny

is a *new trial court procedure* (and, originating in a trial court, it carries a right of appeal) whereby the convicted one may invoke mandamus, repeatedly and apparently as often as occasion may arise, to try to compel the warden to exercise discretion to require the district attorney to file proceedings in the trial court, impanel a jury and try anew the question of the defendant's sanity. All this, notwithstanding that the warden has already once so acted, that a trial has been had, a judgment rendered and that the sole question properly to be raised, within the requirements of due process, is whether the original judgment of insanity still is operative. It is still operative if the defendant remains insane and gives him all the protection which a new trial and judgment could give him; but if defendant has recovered his sanity the judgment by its own terms has expired and defendant should be executed. As is hereinafter shown habeas corpus is traditionally, and by earlier decisions of this court, the sole and exclusive remedy to settle the single issue.

In the opinion prepared by Justice Edmonds it is said that "Where a prisoner seeks to invoke the statutory remedy provided by section 3701 of the Penal Code, mandate is the only available proceeding. Thus, upon the assumption that any judicial hearing as to sanity must be afforded one under sentence of death, there are two remedies, each directed to an exclusive form of relief. To acquire a simple judicial determination of the fact of sanity, habeas corpus is the proper and exclusive remedy. But to obtain a jury trial of that issue, as provided by section 3701 of the Penal Code, mandate is the only available and adequate remedy." And that proposition is said to apply here even though defendant has already had the trial as provided for by section 3701. Any one judgment in such a case is said to have no continuing effect because it relates only to sanity as of *its* date and to be immaterial in respect to the claim as of a later date; hence, regardless of the outcome of a first sanity trial under sections 3701 et sequitur the defendant as of a later date may invoke mandamus seeking to compel another trial on the same issue and to the same end. Such a procedure bids fair to be a most useful one for those who would seek unwarranted delays in the execution of death sentences.

Because of the deplorably confused state in which several important branches of the law (habeas corpus, mandamus, *coram nobis,* due process, suspension of the death penalty, con-

flict of laws, trial for insanity of a condemned person, comparative powers of administrative agents and courts, etc.) are left by the present opinion (or lack of one in which a majority of the court agree), read in conjunction with the majority opinion of this court in *In re Phyle* (1947), *supra,* 30 Cal.2d 838, and the opinions of the justices of the United States Supreme Court in *Phyle* v. *Duffy* (1948), 334 U.S. 431 [68 S.Ct. 1131, 92 L.Ed. 1494], one who would seek to follow the vagaries of the law through the inconsistencies of this case, with the object of rescuing as much as possible of its integrity, should both concur and dissent.

I should concur in the judgment denying relief in this proceeding because: 1. mandamus is not a proper remedy; 2. the relief sought by mandamus has already been accorded the petitioner and a valid judgment determining the very issues sought to be litigated is presently outstanding;[1] 3. there is available (and at all times concerned there has been) the plain, direct and simple remedy of habeas corpus, expressly provided by statute to try the only issues which can properly now be raised (Pen. Code, §§ 1473, 1487(5), 1493). But I should dissent from the judgment because, if the novel suggestion that habeas corpus is not the proper or the exclusive remedy to try the legality of one's imprisonment after sentence (particularly the identity of his jailer, Pen. Code, § 1487(5)) is to be followed, as the opinion of Justice Edmonds suggests, and if mandamus is to be substituted for habeas corpus or added as an additional remedy (not to directly determine the legality of the place of detention or identity of the custodian but to compel a third person administrator to exercise discretion to initiate proceedings to cause a district attorney to start proceedings in a trial court to try anew before a jury as of a new date the question of petitioner's sanity), then it must follow, if we accord any weight at all to the earlier verdict of the jury and outstanding judgment of the superior court, that as a matter of law there is shown ''good reason to believe that a defendant, under judgment of death, has become

---

[1]This is true unless we are to hold that the mere passage of time alters the issues and consequently entitles a condemned person to repeated trials in a trial court on the same issues as of each new date he may select; or, if the warden or district attorney neglect to suggest or institute such trials then, by the majority opinion, the condemned person, apparently as often as he may ask, is entitled to a trial—*in the trial court*—''labeled mandamus,'' and, if the judgment be adverse, to an appeal from such ruling.

insane'' (Pen. Code, § 3701) and the duty of the warden would appear to require the reinitiation of the roundabout and cumbersome procedures above mentioned.

A brief statement of the facts is here pertinent. On February 20, 1946, William Jerome Phyle was convicted of the crime of murder of the first degree and sentenced to death. The judgment of conviction was affirmed (*People* v. *Phyle* (1946), 28 Cal.2d 671 [171 P.2d 428]). In December of that year, in a proceeding duly instituted by the district attorney at the suggestion of the warden of San Quentin Prison under the provisions of section 3701 of the Penal Code, a jury found that Phyle was insane. Our statute prohibits execution of the insane (Pen. Code, § 1367). The judgment of the superior court, following the verdict, determined that Phyle was then insane and adjudged that he be confined in the state hospital for the insane ''until his reason be restored.'' Twenty-five days later (18 days after Phyle's admission to the hospital) the superintendent of the hospital, without trial or hearing, without judicial determination that Phyle had become sane, and without any determination upon any prescribed or ascertainable standard, certified to the governor that Phyle had recovered his sanity and he was returned to the warden of the prison for execution. That is to say, the place of Phyle's confinement and the identity of his jailer were changed; he was transferred from the custody of the superintendent of the state hospital for the criminal insane to the custody of the warden of a state prison. If, in truth, Phyle continued to be insane the judgment of the court required that he be kept in the hospital; as long as he remained insane the judgment remained effective and his imprisonment in any institution other than the state hospital or by any custodian other than the hospital superintendent would be unlawful. Phyle contended that the transfer was unlawful, that his detention by the warden was unlawful, and that the superintendent of the hospital remained his lawful custodian. He sought relief by application for the writ of habeas corpus, alleging the facts as to the jury trial, the rendition of judgment and his commitment to the hospital. *Phyle alleged, and it was not denied by the State, that in truth ''said Phyle was, and still is, insane.''* Nevertheless, the majority of this court held that the ruling of the sole administrative agent (the hospital superintendent), even though arrived at by no fixed or ascertainable standard, was supreme; that his ruling, regardless of lack of standard,

completely and irrevocably terminated the judgment of the court; that Phyle must be executed on the agent's ruling; and that neither this court nor any other had jurisdiction to review the administrative order. (*In re Phyle* (1947), *supra,* 30 Cal. 2d 838.) Thereafter the United States Supreme Court issued certiorari but on the hearing accepted a statement of the Attorney General of California to the effect that this court did not rule that Phyle was entitled to no judicial review of the administrative agent's order, but held only that habeas corpus was the wrong remedy and that a procedure "labeled mandamus" was the proper, and an available, remedy (whether to review the agent's order or to again try, as of a new date, the issue of Phyle's sanity, is not entirely clear) and upon that novel theory dismissed the certiorari proceeding. (*Phyle* v. *Duffy* (1948), *supra,* 334 U.S. 431.)

That the attorney general was mistaken in his representation, at least insofar as the intention of this court is concerned, is known to all of us and is apparent from the language used by the majority. They declared that (*In re Phyle* (1947), *supra,* 30 Cal.2d 838, 840-841) "The only question presented is whether a person who has been adjudged insane after conviction, sentence, and delivery to a warden of a state prison for execution, has the right to a judicial determination of the question of his restoration to sanity. . . . [pp. 842-843] There is no authority . . . for the proposition that defendant has a right to habeas corpus *or other judicial proceeding* to determine the question of his sanity after his release from the state hospital. In fact, section 3700 of the Penal Code expressly prohibits[2] such a proceeding." (Italics added.) Making their position still more clear, they continued "[p. 845] Where there is a statute that declares that the superintendent of the state hospital where the prisoner is confined may

[2] A reading of the statute (Pen. Code, § 3700) discloses that it does *not* "expressly prohibit [ ]" any such proceeding. The context of the statement suggests that it should be understood as *argumentum ad auctoritatem praestandam*; it argues that since the court itself may not (it assumes or declares as a premise) suspend execution in any case but on appeal, then the power and jurisdiction to review in any case but on appeal are to be understood as *impliedly* prohibited. In other words this argument, sweeping aside without comment all constitutional considerations of due process (see *People* v. *Shorts* (1948), 32 Cal.2d 502, 506 [197 P.2d 330]; *Mooney* v. *Holohan* (1935), 294 U.S. 103, 110 [55 S.Ct. 340, 79 L.Ed. 791, 98 A.L.R. 406]; *Taylor* v. *Alabama* (1948), 335 U.S. 252 [68 S.Ct. 1415, 92 L.Ed. 1935]) would completely abolish habeas corpus, *coram nobis,* and all other judicial remedies in death penalty cases, except appeals from the judgment of conviction.

declare the prisoner's sanity restored,[3] a person awaiting execution has no right to a [p. 846] judicial determination of his restoration to sanity . . . By adopting section 3700 of the Penal Code prohibiting the courts from suspending the execution of judgment of death except on appeal, the Legislature has provided in effect that the courts of this state are without power [regardless of constitutional provisions], except as provided by statute, to determine the sanity of a person who has been sentenced to be executed for a capital offense and is in the custody of the warden . . . for the purpose of execution . . . Thus, regardless of what the common law powers of a court may be, when the procedure for the determination of the question of sanity of a person who has been sentenced to death is covered by statute, a court has no inherent power to determine that question and such a person has no right to a judicial determination of the question unless the statutes so provide . . . [p. 847] The question remains whether the statutory procedure [as interpreted by the majority] for determining the question of restoration to sanity is constitutional. Petitioner contends that defendant has a right to an adjudication of the question of his sanity, protected by the due process clauses of the Constitution of the United States and the Constitution of California. *There is no such right under either Constitution* [italics added] . . .

"[p. 849] The petitioner contends also that the separation of powers provision of section 1 of article III of the California Constitution is violated by leaving the final determination of a prisoner's sanity to administrative officers . . . [p. 850] Even if it be assumed that the power of the superintendent of the state hospital, to whom defendant was delivered, to determine whether defendant has recovered his reason is a judicial power, the foregoing provisions of the California Constitution authorize the delegation of this power. Under the statutes the prisoner is delivered to the custody of the superintendent as a person convicted of a felony, and thereafter, so far as the superintendent's authority over such a person is concerned the superintendent exercises not only the authority of an officer entrusted with the superintendence of an

---

[3]Our statute purports only to authorize the superintendent to declare the fact when it has been in some way previously ascertained and determined; certainly it does not expressly, and there is at least grave doubt that it does impliedly, authorize the superintendent to himself determine the fact; nor does it establish any standard by which the determination shall be made by court or layman. (See Pen. Code, §§ 3701-3704.)

institution for convicted felons but the duties and functions prescribed in Penal Code, section 3704.

"It follows that unless the warden of the prison in which defendant is incarcerated believes that defendant is now insane, no court of this state has jurisdiction to determine the question of his sanity."

That the above quoted views and holdings of this court are irreconcilably inconsistent with the indicated views of the Supreme Court of the United States is apparent from a reading of *Phyle* v. *Duffy* (1948), *supra*, 334 U.S. 431 [68 S.Ct. 1131, 92 L.Ed. 1494]. Such quoted views are likewise, as pointed out in my dissent in *In re Phyle* (1947), *supra*, 30 Cal.2d 838, 854, et seq., squarely contrary to the earlier holdings of this court in *Gardner* v. *Jones* (1899), 126 Cal. 614, 615-616 [59 P. 126], and *In re Buchanan* (1900), 129 Cal. 330, 332-333 [61 P. 1120, 50 L.R.A. 378], with which earlier cases the views of the United States Supreme Court appear to be in full accord.

The irreconcilable difference between the United States Supreme Court and our majority is pointed up forcefully by Mr. Justice Frankfurter, concurring in *Phyle* v. *Duffy, supra* (pp. 444-445 of 334 U.S.) : "The court now finds that *all that the California Supreme Court did was to hold that as a matter of California procedure* [italics added] the petitioner's claim could not be passed on by the direct remedy of habeas corpus, but that there is available a special local remedy, labeled mandamus, whereby the petitioner can judicially test his present sanity . . . Whatever may be the elegancies of procedure by which the matter is to be determined, *our decision declining to consider the grave constitutional issues which we thought we had before us, is contingent upon a determination by the Supreme Court of California that the law of that state is what our decision presupposes it to be* [italics added], namely, that California by a remedy which California chooses to call mandamus enables the present petitioner to secure a judicial determination of his present sanity. *This means, of course, not the very restricted scope of relief which is normally associated with the traditional remedy of mandamus.* [Italics added.] It presupposes that California affords petitioner the means of challenging in a substantial way the *ex parte* finding of the Superintendent of the State Hospital . . . and enables him to secure judicial determination of the claims he has made in his petition for *habeas corpus,* which, so the Court now

holds, is not the proper way to proceed.'' The majority of this court now cite and rely on the above quoted proposition yet every member of this court knows that no such idea was considered or intended by this court in *In re Phyle*. This court did not deny habeas corpus on the ground that simply ''as a matter of California procedure'' mandamus was the proper —and exclusively the proper—remedy; quite differently, the majority denied habeas corpus solely and exclusively because they intended to hold that the power of the administrative agent was supreme and that petitioner, having been ruled on by the administrative agent, had no right to *any* judicial review. The majority opinion, as already noted, expressly declares (pp. 840-841 of 30 Cal.2d), ''The only question presented is whether a person who has been adjudged insane after conviction . . . has the right to a judicial determination of the question of his restoration to sanity.'' Since the question stated was the only question which the majority considered to be properly before them it is not surprising that all the discussion in the opinion is directed to the end of supporting their declared conclusion that a person in the position of defendant petitioner has no right whatsoever to any judicial process.

Certain it is that this court did not intend to rule that defendant petitioner did have a right to judicial review of the administrative agent's ruling and that, having such right, habeas corpus was an improper, and mandamus the only proper, remedy.

That mandamus is not a proper vehicle here is apparent at once. Mandamus is an extraordinary remedy and ''is to be resorted to only in cases where the usual and ordinary forms of remedy are insufficient to afford redress.'' (16 Cal.Jur. § 17, p. 784.) Habeas corpus is the usual and ordinary remedy for trying out the legality of the place of one's detention. Our Penal Code expressly provides for just such situations as that presented here: Section 1473 provides that ''Every person unlawfully imprisoned or restrained of his liberty, under any pretense whatever, may prosecute a writ of habeas corpus, to inquire into the cause of such imprisonment or restraint''; sections 1486, 1487(5) and 1493 provide that when a person is detained under court commitment but ''When the person having the custody of the prisoner is not the person allowed by law to detain him,'' the court shall exercise the writ and ''order such party to be committed to the restraint or custody of such person as is by law entitled thereto.'' It is, and con-

sistently has been since his adjudication of insanity, the position of defendant petitioner that the superintendent of the state hospital, not the warden of the prison, is entitled to his custody. That position is correct so long as defendant remains legally insane and the judgment of the superior court perdures. Whether the final judgment of a court of record continues in effect is a question which a court, rather than a layman, should, in the last analysis, determine. Likewise, if rights (to life or death or to property or liberty) depend on it, a person should certainly be entitled to have a judicial determination as to whether he is *legally* insane. Unless the court determines that fact neither the prisoner nor any court can know by what standard the fact has been determined. Our code provides no standard for determining legal insanity; our courts have set one up for their own proceedings but there is none prescribed for administrative agents. Even if we assume that the hospital superintendent has the power to make a prima facie or preliminary determination of restoration to legal sanity his determination must be subject to judicial review. That much seems clear from the United States Supreme Court's language in *Phyle* v. *Duffy* and *Ng Fung Ho* v. *White* (1921), 259 U.S. 276 [42 S.Ct. 492, 66 L.Ed. 938]. The obvious, the direct and the ordinary method for applying the judicial test in such cases is habeas corpus.

The difficulty we are facing stems from the majority holding in *In re Phyle* (1947), *supra,* 30 Cal.2d 838, joined with what appears to have been spur-of-the-moment adroitness of the attorney general in defending the majority opinion before the Supreme Court of the United States. The error of this court lay in holding that the ruling of the administrative agent (the medical superintendent of a hospital) terminating or superseding the judgment of a superior court was not subject to any judicial review in any court. The error of the attorney general, which was accepted and relied upon by the United States Supreme Court as the basis for its decision, lay in interpreting our majority decision not as denying the right to all judicial review but simply as denying habeas corpus as inappropriate, while suggesting mandamus as the appropriate, vehicle for review. But, as previously shown, our court made and intended no such holding. Every member of our court knows that the majority intended to hold that the ruling of the administrative agent was not subject to any judicial review. If our court had intended a contrary holding

—that the petitioner was entitled to a judicial review of the administrative agent's holding; i. e., to a judicial determination of the legality of his place of detention and the identity of his jailer (see Pen. Code, §§ 1473, 1487(5), 1493, *supra*)—I think it is reasonably certain that at that time a majority if not all of the court would have held that habeas corpus was the proper remedy. I am sure that no member of the court, in making his decision, contemplated suggesting that the decision should be sustained on the theory that it admitted of judicial review for the agent's ruling and that mandamus as contradistinguished from habeas corpus was the proper vehicle for that review.

Unless this court is to perpetuate and encourage error, confusion, delays and cumbersome procedural griefs, both in this court and elsewhere, in the administration of criminal law in death penalty cases the correct and exclusive procedure in such cases as this—habeas corpus—should be pointed out and adhered to rather than abandoned or augmented by an additional trial court procedure.

In the previous application for habeas corpus, the rendition and entry of the judgment, after trial by jury, determining petitioner to be insane were alleged and it was further averred *and not denied* that petitioner was still (as of that date) insane. Unless the so-called ruling of the administrative agent that petitioner had been restored to sanity is, as was then held by the majority, entirely beyond judicial reach, then habeas corpus was and still is the proper, the plain, the direct, and the exclusive remedy. Until *In re Phyle* that had been the law since *Kellogg* v. *Cochran* (1890), 87 Cal. 192, 197 [25 P. 677, 12 L.R.A. 104].

It is my view that under the circumstances shown here habeas corpus is the only proper and the most desirable remedy. Petitioner has already had the remedy provided by sections 3701 and 3703 of the Penal Code. The warden did believe that petitioner was insane; he acted on that belief; the question of petitioner's sanity was duly brought to trial before a jury; the jury found petitioner to be insane; judgment so decreeing was duly entered; no motion for new trial was made and no appeal was taken; the judgment remains outstanding, fully valid and operative unless petitioner has recovered his sanity. Whether or not he has recovered his *legal* sanity is the decisive question. That is the fact question for judicial determination; upon that fact depends the legal question as to whether petitioner shall be in the custody of

the superintendent of the hospital or that of the warden of the prison. Habeas corpus is the established, convenient, available and ordinary remedy to try out both the factual and legal issues.

On the other hand, if the court is to gore itself on the other horn of its dilemma, then, as heretofore indicated, I think that the original insanity proceedings in themselves (all had "after . . . [petitioner's] delivery to the warden for execution"), particularly in the light of the solemn judgment based on the jury's verdict, constitute, as a matter of law, "good reason to believe that a defendant . . . had become insane" "after his delivery to the warden for execution" and, hence, that if an administrative agent thereupon and thereafter assumes to differ with such judicial determination, one of two things should inevitably follow (at least if his ruling is challenged) : Either the judgment should be respected and upheld as against the administrative agent or proceedings should be had in a court of competent jurisdiction to set aside and annul the judgment or to supersede it with one of at least equal and later authority—one which we can know is based on the same standard of legal insanity  as was the one to be superseded.

The judgment that had been entered decreed that petitioner was insane, committed him to the state hospital for the criminal insane, and adjudged that he be *there* confined "until his reason be restored." The basic contention of petitioner is that his reason, by legal standards, has not in fact been restored. If in truth his reason, by such standards, has not been restored the judgment already rendered fully protects him against execution while insane; a new judgment to that effect can add nothing; the new one could be set aside as quickly as the old one; it would have no more prima facie or ultimate value than the old one. There is then no occasion for a new trial under section 3701 et sequitur. But if in truth and upon *legal standards* petitioner has recovered his reason, that fact can easily and promptly be ascertained and determined with legal finality in a habeas corpus proceeding. There is no occasion for inviting the uncertainty, circuity, appeals and other delays attendant upon the added trial court procedure here sought to be innovated.

For the reasons stated it seems obvious that at this stage of the prosecution of Phyle and under the circumstances which have been enumerated, the application for mandamus is inappropriate. It is inappropriate because the remedy it seeks

has already been accorded to Phyle; he has had the jury trial for which provision is made; he has been adjudged insane and the judgment still stands, as fully efficacious—if Phyle remains legally insane—as a new judgment under new proceedings could be. And the simplest and most direct vehicle for determining whether he is still insane by the judicial standard, the only one which avoids appeal by the petitioner, and other indirection and causes of delay, is the ordinary one of habeas corpus.

The total undesirability of following the newly suggested expedient of substituting mandamus for habeas corpus or of setting it up as an independent and additional procedure (as a method for review of proceedings after trial and judgment of insanity in proceedings pursuant to Penal Code, section 3701 et sequitur) is emphasized by the consideration of what must follow if rationality and consistency are to obtain: If we assume that the remedy petitioner seeks here is a proper one, technically, notwithstanding the outstanding judgment, then it would seem to follow that surely such outstanding judgment must be accorded some weight, some prima facie significance; it should be considered as establishing, as a matter of law, that ''good reason'' exists for believing petitioner to be insane. General legal insanity, once adjudicated, is presumed to continue until the contrary is shown. (14 Cal.Jur. § 19, p. 363; 28 Am.Jur. § 121, p. 751; *Estate of Baker* (1917), 176 Cal. 430, 436 [168 P. 881].) The judgment, itself, constitutes ''good reason'' for believing Phyle to be insane. As emphasized in the opinion of the United States Supreme Court (p. 443 of 334 U.S.) it is not the *belief* of the warden nor the *fact* of insanity which must control the right to a *jury trial* of sanity if the procedure under section 3701 et sequitur be available. The court said: ''In considering what the issues may be in a mandamus proceeding, it must be borne in mind that the warden is under a mandatory duty to initiate judicial proceedings, not *when* a defendant is insane, but when *'there is good reason to believe'* he is insane.'' (Italics are those of court.) And the ''judicial proceedings'' so made available are by the statute expressly and mandatorily made to encompass a jury trial. '' [T]he court must at once cause to be summoned and impaneled, from the regular jury list . . . a jury of 12 persons to hear such inquiry.'' (Pen. Code, § 3701.) The duty of the warden then would seem obvious: since ''good reason'' exists for the belief that petitioner is insane, the

warden has no power to try out the ultimate fact; that fact must be determined by a jury. If mandamus be available the warden, under the circumstances shown here, has no discretion to do otherwise than again initiate the roundabout proceedings for another jury trial and judgment which could be, according to the majority, at once set aside by the hospital superintendent. But whether the warden initiates such special proceeding or not the petitioner, by this newly suggested procedure, is given a right *to a hearing of some kind in a trial court,* and, since it is in a trial court, he has a right to appeal in the event of an adverse decision. On the other hand, if we adhere to the traditional and statutory remedy of habeas corpus the procedure is well defined and direct. It affords ample protection and expeditious procedure to both the condemned and to the State. The protection of the state (and of the court) against groundless applications is simple; it is that which we use constantly in other applications of the writ. We require a prima facie showing of evidentiary facts and do not issue the writ on the bald allegation of a conclusion or ultimate fact. By way of example, when application for the writ is made on the ground of denial of due process in that the prosecution has introduced and relied upon perjured testimony, with knowledge of its falsity, we require more than the conclusionary averment of the asserted ultimate fact; we require a specification of the evidence in detail and of the circumstances showing knowledge of its falsity by the prosecution. A similar prima facie specification of evidentiary matters should be required in applications for the writ under the circumstances shown here.

The present case is not controlled by *Williams* v. *Duffy* (1948), 32 Cal.2d 578 [197 P.2d 341]. In that case the question of the sanity of the prisoner condemned to death was raised for the first time by application for the writ of mandate. There was not there, as there has been here, a trial and an existing, at least prima facie valid, judicial determination that the prisoner was insane. Whether mandamus is, or is not, available as a remedy in an application of first instance as in the Williams case we need not here consider.

For the reasons above stated I would affirm the judgment solely on the ground that under the circumstances shown mandamus is an inappropriate, and habeas corpus is the only appropriate, remedy; but if the majority are to retroactively, as it were, adopt the suggestion of the attorney general and

the assumption of the United States Supreme Court, and now hold that mandamus is an appropriate remedy, whether exclusive or additional, then the judgment should be reversed.

Carter, J., concurred.

Appellant's petition for a rehearing was denied August 25, 1949. Carter, J., and Schauer, J., voted for a rehearing.