## APPLICATION OF PHYLE.
### No. 30293.

United States District Court,
N. D. California, S.D.
Jan. 23, 1951.

Morris Lavine, Los Angeles, for petitioner.

Edmund G. Brown, Atty. Gen., By Clarence A. Linn, Deputy Atty. Gen., for State of California.

HARRIS, District Judge.

In the late afternoon of Thursday, January 19, 1951, William Jerome Phyle, through his mother, presented to this Court a Petition for Writ of Habeas Corpus. It was alleged therein, in substance, that he was unlawfully detained by the Warden of San Quentin penitentiary; that he was to be executed the following morning; that he was denied due process within the meaning of the Fourteenth Amendment; that he was insane and entitled to a hearing on the matter of his alleged restoration to san-

ity, under the provisions of Section 3704, Penal Code of the State of California as amended in 1949.

This Court, after a careful analysis of the petition, the background of the case as reflected in the reported decisions, which will be referred to at length hereafter, and the law as applicable, duly and regularly issued the Order to Show Cause herein returnable Monday, the 22nd of January, 1951, at 10 o'clock a. m. Execution of the death sentence was stayed pending a determination of the important issues and in order to gain a full comprehension of the grave and extensive issues involved.

A brief statement of the full factual background is pertinent:

On February 20, 1946, William Phyle was convicted of the crime of murder of the first degree and sentenced to death. The judgment of conviction was affirmed, People v. Phyle, 1946, 28 Cal.2d 671, 171 P.2d 428. In December of that year, in a proceeding duly instituted by the District Attorney at the suggestion of the Warden of San Quentin prison under the provisions of Section 3701 of the Penal Code, a jury found that Phyle was insane. Our state statute prohibits execution of the insane, Pen.Code Section 1367. The judgment of the Superior Court, following the verdict, determined that Phyle was then insane and adjudged that he be confined in the State Hospital for the insane "until his reason be restored." Twenty-five days later (eighteen days after Phyle's admission to the hospital) the superintendent of the hospital, without trial or hearing, without judicial determination that Phyle had become sane, and without any determination upon any prescribed or ascertainable standard, certified to the Governor that Phyle had recovered his sanity and he was returned to the Warden of the prison for execution. That is to say, the place of Phyle's confinement and the identity of his jailer were changed; he was transferred from the custody of the superintendent of the state hospital for the criminal insane to the custody of the warden of a state prison. If, in truth, Phyle continued to be insane the judgment of the court required that he be kept in the hospital; as long as he remained insane the judgment remained effective and his imprisonment in any institution other than the state hospital or by any custodian other than the hospital superintendent would be unlawful. Phyle contended that the transfer was unlawful, that his detention by the warden was unlawful, and that the superintendent of the hospital remained his lawful custodian. He sought relief by application for the writ of habeas corpus, alleging the facts as to the jury trial, the rendition of judgment and his commitment to the hospital. *Phyle alleged, and it was not denied by the State, that in truth "said Phyle was, and still is, insane."* Nevertheless, the majority of the Supreme Court held that the ruling of the sole administrative agent (the hospital superintendent), even though arrived at by no fixed or ascertainable standard, was supreme; that his ruling, regardless of lack of standard, completely and irrevocably terminated the judgment of the court; that Phyle must be executed on the agent's ruling; and that neither this court nor any other had jurisdiction to review the administrative order. In re Phyle, 1947, supra, 30 Cal.2d 838, 186 P.2d 134. Thereafter the United States Supreme Court issued certiorari but on the hearing accepted a statement of the Attorney General of California to the effect that the Supreme Court did not rule that Phyle was entitled to no judicial review of the administrative agent's order, but held only that habeas corpus was the wrong remedy and that a procedure "labeled mandamus" was the proper, and an available, remedy (whether to review the agent's order or to again try, as of a new date, the issue of Phyle's sanity, is not entirely clear) and upon this novel theory dismissed the certiorari proceeding. Phyle v. Duffy, 1948, supra, 334 U.S. 431, 68 S.Ct. 1131, 92 L.Ed. 1494. See: Id., 34 Cal.2d 144, 166, 167, 208 P.2d 668.

It is necessary that the Court, at this juncture, set forth at considerable length the basic reasons underlying the granting of the preliminary order herein, to the end that clarification may be had with respect to the unwarranted attack launched against

this Court by a Deputy Attorney General of the State of California.

In referring to this Court's judicial conduct, the following statements appeared in the local press under the captions, "Phyle death stay assailed"—and, "Mockery of justice says state attorney as reprieve is granted;" no doubt, such statements were carried by the wire services throughout the whole of the United States. "This is the sort of thing that makes a mockery of justice," declared Deputy Attorney General Clarence Linn in announcing that he would appear personally in Judge Harris's court Monday to argue against the writ.

"Inquiry would have disclosed that on two occasions the Supreme Court of the United States had passed on the matter of Phyle's execution," Linn added. "It would seem that the Supreme Court's decision would be binding on a lower court." I am filing with the Clerk of this Court the news clippings as appearing in the San Francisco Examiner and the San Francisco News under dates of January 20, 1951, and January 19, 1951, respectively, to the end that Linn's conduct may for all time be memorialized in the annals of this Court, and the records of this case.[1]

A District Judge's examination and scrutiny of a petition of this nature is usually attendant with extreme difficulty, for as a rule, applications are presented at a late hour—and often when the condemned man is being made ready for the death-chamber.

That such procedure is a hardship upon the Courts may well be true. Trial judges, however, for generations have been confronted with such procedural complexities and so long as we have the great Writ of Habeas Corpus, and until it is suspended, courts must be subjected to the rigors of such extraordinary applications.

This Court is fully conscious of and conversant with the problems of jurisdiction attendant upon such petitions, and the comity which should, and must, prevail between State and Federal jurisdictions.

The comments of Mr. Justice Frankfurter in Darr v. Burford, 339 U.S. 200, 220 and 232, 70 S.Ct. 587, 598, are particularly significant at this juncture.

"1. The course of our decisions on the power of the lower federal courts to entertain an application for a writ of habeas corpus on behalf of State prisoners has not run smooth. There is a reason. This seemingly technical problem of jurisdiction concerns the relation of the United States and the courts of the United States to the States and the courts of the States. Under any circumstances this 'is a very delicate matter that has occupied the thoughts of statesmen and judges for a hundred years * * *.' Memorandum of Mr. Justice Holmes, August 20, 1927, denying an application for stay pending a petition for certiorari. 5 The Sacco-Vanzetti Case 5516.

"Prior to the Civil War, habeas corpus was available in the United States courts, barring limited exceptions, only for those in federal custody. The Act of February 5, 1867, extended the power of the United States courts to grant writs of habeas corpus to 'all cases where any person may be restrained of his * * * liberty in violation of the constitution, or of any treaty or law of the United States * * *.' 14 Stat. 385. A conflict between State and federal authorities in relation to the administration of criminal justice touches that 'very delicate matter' at its most sensitive point. The Act of 1867 opened wide the door to that conflict. It has become intensified during the last twenty years because of the increasing subjection of State convictions to federal judicial review through the expanded concept of due process. See, e. g. Powell v. State of Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, and Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791. It ought not to be too surprising, therefore, that the full implications of federal restrictions upon the free range of a State's criminal justice have taken time to unfold. * * *

"10. Nor need we be concerned lest the federal District Courts will lightly inject themselves into the State criminal process and open wide the State prison doors. Experience completely dispels such excogi-

1. See exhibits attached.

tated fears. The District Courts are presided over by judges who are citizens of the State, with loyalties to it no less strong than those of the judges of the State courts. Judges often come to the federal courts from the State courts. The proof of the pudding is in the eating. The showing is overwhelming that the District Courts grant writs of habeas corpus most sparingly and only with due regard for this Court's decisions under the Due Process Clause.[2]

"Even though a petition for habeas corpus in a federal District Court may involve constitutional questions which were found against the petitioner by the highest court of his State, *the District Court is not sitting as a court of review of the State court. A petition for habeas corpus in a federal court, after the State process has been exhausted, 'comes in from the outside,' as Mr. Justice Holmes phrased it in his dissenting opinion in Frank v. Mangum, 237 U.S. 309, 345, 346, 35 S.Ct. 582, 594, 595, 59 L.Ed. 969; a view which established itself as law in Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543. If it be suggested that as a matter of appearance, legal analysis apart, a federal District Court might be granting relief which the highest court of the State had denied, the same unanalyzed appearance would attach to a District Court's granting relief after this Court had denied it."* (Italics ours.)

Mr. Clarence Linn, in my opinion, has engaged in conduct unbecoming an officer of this Court, as well as a Chief Deputy in the Attorney General's office. He has made serious and unfounded charges against this Court, reflecting not only on me individually as a judicial officer, but as well on the administration of justice in the Federal courts as a whole.

Therefore, under the circumstances of this case and the subsequent wide attention given to Mr. Linn's groundless charges, I feel obliged to make known for the record herein, and for my brethren on this bench, the reasons underlying my initial decision to issue an Order to Show Cause herein and to stay the execution of the death penalty pending a final judicial determination of the very complex problems presented.

The charges contained in the press statements are quite plain and the implications fairly manifest.

Reference in this connection is made to the concurring and dissenting opinion of Mr. Justice Schauer, concurred in by Mr. Justice Carter, in Phyle v. Duffy, 34 Cal. 2d 144, 167, 171, 208 P.2d 668; also, Phyle v. Duffy, 334 U.S. 431, 441 and 445, 68 S. Ct. 1131, 92 L.Ed. 1494.

It was Mr. Linn who first and erroneously evoked the suggestion before the Supreme Court of the United States concerning the availability and the scope of the writ of mandamus; it is plainly inferable that this was done by him in order to avoid the consequences and the possibility of a reversal.

In this particular, the opinion of the Supreme Court in Phyle v. Duffy, supra, reads in part, 334 U.S. 431 at page 439 et seq., 68 S.Ct. 1131 at page 1134:

"What has been said previously indicates the gravity of the questions here raised under the due process clause as heretofore

2. The Administrative Office of the United States Courts has compiled the following statistics:

| Fiscal Years | 1945–46 | 1946–47 | 1947–48 | 1948–49 |
|---|---|---|---|---|
| Habeas corpus cases involving State prisoners disposed of by District courts | 503 | 481 | 487 | 610 |
| Cases in which petitioners were successful | 14 | 13 | 11 | 10 |
| Percentage of cases in which petitioners were successful | 2.8% | 2.7% | 2.3% | 1.6% |

See Speck, Statistics on Federal Habeas Corpus, 10 Ohio State L.J. 337, 357 (1949).

construed by this Court, both the contention that execution of an insane man is offensive to the fundamental principles of liberty and justice which lie at the base of all our civil and political institutions, Adamson v. People of State of California, 332 U.S. 46, 54, 67 S.Ct. 1672, 1677, 91 L.Ed. 1903; Carter v. People of State of Illinois, 329 U.S. 173, 175, 179, 67 S.Ct. 216, 218, 220, 91 L.Ed. 172, and the different contention that life shall not be taken by a state as the result of the unreviewable *ex parte* determination of a crucial fact made by a single executive officer. See Ng Fung Ho v. White, 259 U.S. 276, 42 S.Ct. 492, 66 L.Ed. 938. It is not appropriate for us to pass on such constitutional questions in this habeas corpus case if, as the California attorney general contends, there is a state remedy by mandamus available to petitioner under which he can invoke judicial action to compel the warden to initiate judicial proceedings, and in which mandamus proceedings the court will hear and consider evidence to determine whether there is 'reason to believe' that the petitioner is insane. New York ex rel. Whitman v. Wilson, Warden, 318 U.S. 688, 63 S.Ct. 840, 87 L.Ed. 1083; Woods v. Nierstheimer, 328 U.S. 211, 66 S.Ct. 996, 90 L.Ed. 1177; Carter v. People of State of Illinois, 329 U.S. 173, 67 S.Ct. 216, 91 L.Ed. 172. See also Simon v. Craft, 182 U.S. 427, 437, 21 S.Ct. 836, 840, 45 L.Ed. 1165.

"The State Supreme Court in denying habeas corpus said that the state statutes made 'no provision for a judicial determination of the question of the sanity of a defendant delivered to the warden of a state prison for execution except as set forth in section 3701.' That is the section which requires a judicial inquiry with a court and jury only when and if the warden certifies that 'there is good reason to believe' that a person sentenced to death has 'become insane.' But it does not necessarily follow from the fact that petitioner cannot obtain a full-fledged judicial hearing as to sanity on his own motion made directly to a state court that he is without some other adequate state remedy. And the state attorney general asserts here that the petitioner does have an 'ample

remedy, if the facts support him, by application to the California courts for a writ of mandamus' to compel the warden to institute proceedings under § 3701.

*"Thus we have an unequivocal declaration by the state attorney general that petitioner has not attempted to take advantage of an available state remedy. The attorney general is the highest non-judicial legal officer of California, and is particularly charged with the duty of supervising administration of the criminal laws.* His statement on this question is entitled to great weight in the absence of controlling state statutes and court decisions." (Italics ours.)

Mr. Justice Frankfurter, whom Mr. Justice Douglas, Mr. Justice Murphy and Mr. Justice Rutledge join, concurring:

"Where life is at stake one cannot be too careful. I's had better be dotted and t's crossed. And so I deem it proper to state my understanding of the opinion of the Court, on the basis of which I concur in it.

"We granted certiorari to review a decision of the Supreme Court of California which dismissed habeas corpus proceedings brought in that court. We did so on the assumption that the case raised questions under the Fourteenth Amendment—more particularly, whether an unreviewable determination by the superintendent of a State hospital, that one convicted of murder and found to have become insane after conviction had been restored to sanity and therefore was subject to execution, was consistent with the due process which the Fourteenth Amendment secures. The Court now finds that all that the California Supreme Court did was to hold that as a matter of California procedure the petitioner's claim could not be passed on by the direct remedy of habeas corpus, but that there is available a special local remedy, labeled mandamus, whereby the petitioner can judicially test his present sanity. In short, the Court dismisses the writ of certiorari because the decision of the court below rests on a purely State ground in that there is a State remedy available, which has not been pursued, by means of which he can secure the rights he claims under the United States Constitution.

"Of course I recognize the weight to be attached to the Attorney General's views regarding the law of California. But the controlling voice on California law is that of the Supreme Court of California. Whatever may be the elegancies of procedure by which the matter is to be determined, our decision declining to consider the grave constitutional issues which we thought we had before us, is contingent upon a determination by the Supreme Court of California that the law of that State is what our decision presupposes it to be, namely, that California by a remedy which California chooses to call mandamus enables the present petitioner to secure a judicial determination of his present sanity. This means, of course, not the very restricted scope of relief which is normally associated with the traditional remedy of mandamus. It presupposes that California affords petitioner the means of challenging in a substantial way the *ex parte* finding of the Superintendent of the State Hospital for the Insane and enables him to secure judicial determination of the claims he has made in his petition for habeas corpus which, so the Court now holds, is not the proper way to proceed.

"Upon this view I concur in the decision and opinion of the Court."

Let us now see what the Supreme Court of the State of California said concerning the activities of Mr. Linn when the matter again came before it.

In Phyle v. Duffy, supra [34 Cal.2d 144, 208 P.2d 684], arising out of the subsequent proceedings in mandamus to compel the warden of the State prison to institute proceedings for determination of the sanity of Phyle, then under sentence of death, it was said by Mr. Justice Schauer:

"The difficulty we are facing stems from the majority holding in In re Phyle (1947), supra, 30 Cal.2d 838, 186 P.2d 134, *joined with what appears to have been spur-of-the-moment adroitness of the attorney general in defending the majority opinion before the Supreme Court of the United States.* The error of this court lay in holding that the ruling of the administrative agent (the medical superintendent of a hospital) terminating or superseding the judgment of a superior court was not subject to any judicial review in any court. *The error of the attorney general, which was accepted and relied upon by the United States Supreme Court as the basis for its decision, lay in interpreting our majority decision not as denying the right to all judicial review but simply as denying habeas corpus as inappropriate, while suggesting mandamus as the appropriate, vehicle for review. But, as previously shown, our court made and intended no such holding. Every member of our court knows that the majority intended to hold that the ruling of the administrative agent was not subject to any judicial review.* If our court had intended a contrary holding—that the petitioner was entitled to a judicial review of the administrative agent's holding; i. e., to a judicial determination of the legality of his place of detention and the identity of his jailer (see Pen.Code, §§ 1473, 1487(5), 1493, supra)—I think it is reasonably certain that at that time a majority if not all of the court would have held that habeas corpus was the proper remedy. *I am sure that no member of the court, in making his decision, contemplated suggesting that the decision should be sustained on the theory that it admitted of judicial review for the agent's ruling and that mandamus as contradistinguished from habeas corpus was the proper vehicle for that review.*

"Unless this court is to perpetuate and encourage error, confusion, delays and cumbersome procedural griefs, both in this court and elsewhere, in the administration of criminal law in death penalty cases the correct and exclusive procedure in such cases as this—habeas corpus—should be pointed out and adhered to rather than abandoned or augmented by an additional trial court procedure." (Italics ours.)

Reference is also made to 34 Cal.2d at page 167, 208 P.2d at 681 of the said opinion:

"*That the attorney general was mistaken in his representation, at least insofar as the intention of this court is concerned, is known to all of us and is apparent from the language used by the majority.* They declared that (In re Phyle (1947), supra, 30 Cal.2d 838, 840-841, 186 P.2d 134, 136)

'The only question presented is whether a person who has been adjudged insane after conviction, sentence, and delivery to a warden of a state prison for execution, has the right to a judicial determination of the question of his restoration to sanity. * * * (30 Cal.2d [838] at pages 842-843, 186 P.2d [134] at pages 136, 137.) There is no authority * * * for the proposition that defendant has a right to habeas corpus or other judicial proceeding to determine the question of his sanity after his release from the state hospital. In fact, section 3700 of the Penal Code expressly prohibits such a proceeding.'" (Italics ours.)

It is apparent from the petition for writ of habeas corpus, as well as from the text of the opinion of the California Supreme Court, 34 Cal.2d 144, 208 P.2d 668, on the mandamus question that Phyle was not accorded due process within the meaning of the Fourteenth Amendment and that the proceedings before the Superior Court of Marin County did not result in affording him a hearing or trial in keeping with the clear and explicit mandate of Section 3701 of the Penal Code, or the clear ruling and direction of the Supreme Court of the United States.

In the majority opinion of the California Supreme Court it is said, in part: Mr. Justice Edmonds, 34 Cal.2d 144, 152, 208 P.2d 668. "If, therefore, it is assumed that due process of law requires a judicial inquiry concerning the issue as to sanity, necessarily the conclusion reached in the decision of In re Phyle, supra, is incorrect [30 Cal.2d 838, 186 P.2d 134], and the question for determination here would concern the remedy or remedies available to a person in Phyle's position. In turn, the particular relief sought by Phyle would be the decisive factor."

It may be remembered that Phyle had sought habeas corpus in the earlier proceedings to test the finding of the hospital superintendent, but the Supreme Court of California flatly held that the *ex parte* finding of such Superintendent was beyond review and denied the relief usually afforded by the traditional writ of habeas corpus. See opinion of Mr. Justice Traynor In re Phyle, 30 Cal.2d 840, 186 P.2d 134. See also opinion of Mr. Justice Schauer concurred in by Mr. Justice Carter. Under the circumstances of this case it is plainly inferable that mandamus was not sought or requested by Phyle's counsel or on his behalf. The remedy was thrust and imposed on him as a result of the insistence, however erroneous, of the Deputy Attorney General. Under such circumstances, in my opinion, the full statutory benefits and the complete legislative pattern of the statute should have been accorded him. That the Supreme Court of the United States fully expected such a result is manifest from even a cursory glance at the opinion. 334 U.S. 431, 68 S.Ct. 1131.

Section 3701 of the Penal Code of the State of California then and now reads: "If, after his delivery to the warden for execution, there is good reason to believe that a defendant, under judgment of death, has become insane, the warden must call such fact to the attention of the district attorney of the county in which the prison is situated, whose duty it is to immediately file in the superior court of such county a petition, stating the conviction and judgment, and the fact that the defendant is believed to be insane, and asking that the question of his sanity be inquired into. Thereupon the court must at once cause to be summoned and impaneled, from the regular jury list of the county, a jury of 12 persons to hear such inquiry."

Observe: It is not the warden's belief as to Phyle's sanity or insanity that sets the law in operation, prior to execution, in determining sanity; rather, the section is explicit, when "there is good reason to believe that a defendant under judgment of death has become insane."

Such good reason, of course, was then present in the existing, valid verdict of the jury and judgment predicated thereon finding Phyle insane on or about December, 1946, which verdict has not been set aside, annulled or appealed from.

This important element was completely lost sight of by the distinguished Deputy Attorney General in his blind attempt to invoke Section 3701 of the Penal Code.

It is clear that Mr. Linn labored under the impression that the warden's mental processes and opinions were the subject of inquiry under the writ of mandate and that he, the warden, could be compelled to act only if he believed Phyle insane. Such, I take it, was not in contemplation by the Supreme Court of the United States when that court said, speaking through Mr. Justice Frankfurter, 334 U.S. 445, 68 S.Ct. 1131, 1137: "This means, of course, not the very restricted scope of relief which is normally associated with the traditional remedy of mandamus. It presupposes that California affords petitioner the means of challenging in a substantial way the ex parte finding of the Superintendent of the State Hospital for the Insane and enables him to secure judicial determination of the claims he has made in his petition for habeas corpus which, so the Court now holds, is not the proper way to proceed."

Mr. Justice Edmonds, in speaking for the majority of the California Supreme Court, said, 34 Cal.2d 144, 153, 298 P.2d 668, 673:

"Where a prisoner seeks to invoke the statutory remedy provided by section 3701 of the Penal Code, mandate is the only available proceeding. Thus, upon the assumption that any judicial hearing as to sanity must be afforded one under sentence of death, there are two remedies, each directed to an exclusive form of relief. To acquire a simple judicial determination of the fact of sanity, habeas corpus is the proper and exclusive remedy. But to obtain a jury trial of that issue, as provided by section 3701 of the Penal Code, mandate is the only available and adequate remedy. As stated by Mr. Justice Black: 'In view of this mandatory obligation (under Penal Code, sec. 3701) upon the warden to initiate proceedings if "there is good reason to believe" a defendant sentenced to death is insane, it would be somewhat anomalous, to say the least, if California courts were wholly without power to correct an executive agent's abuse of authority in a matter of such great significance as the execution of insane persons.' Phyle v. Duffy, 334 U. S. 431, 68 S.Ct. 1131, 1135-1136 [92 L.Ed. 1494].

"Throughout the habeas corpus proceeding and the one now under review, Phyle has sought only a jury trial. To obtain such relief, his proper remedy, if any is available, is the proceeding for mandate here under review. But upon the application for the writ itself he is not entitled to a trial by jury; only when he has obtained the writ may he have such a trial, and having failed to show any 'good reason' why the warden should initiate an inquiry, the judgment denying the remedy allowed by section 3701 of the Penal Code must be affirmed.

"It is so ordered."

It is clear, therefore, that Phyle was not accorded a trial in any sense of the word. The California Supreme Court finally reached the interesting conclusion that he was not entitled to either *mandamus* or *habeas corpus* and finally denied the remedy afforded by Section 3701 of the Penal Code.

The petitioner having been forced to invoke Section 3701 (however erroneously), he was entitled to a full and complete hearing with respect to the findings of the Superintendent of the hospital, apart from the Warden's alleged belief or lack of belief, opinion or lack of opinion, and this in strict accordance with the statutory pattern.

Mr. Justice Schauer in concurring and dissenting said in part: 34 Cal.2d 144, 208 P.2d 668.

"Now the error of this court in holding (In re Phyle (1947), 30 Cal.2d 838, 186 P. 2d 134) that habeas corpus was not available as against the ruling of an administrative agent to test the sanity of a person under sentence of death starts to multiply. Its progeny is a *new trial court procedure* (and, originating in a trial court, it carries a right of appeal) whereby the convicted one may invoke mandamus, repeatedly and apparently as often as occasion may arise, to try to compel the warden to exercise discretion to require the district attorney to file proceedings in the trial court, impanel a jury and try anew the question of the defendant's sanity. All this, notwithstanding that the warden has already once so acted, that a trial has been had, a judgment ren-

dered and that the sole question properly to be raised, within the requirements of due process, is whether the original judgment of insanity still is operative. It is still operative if the defendant remains insane and gives him all the protection which a new trial and judgment could give him; but if defendant has recovered his sanity the judgment by its own terms has expired and defendant should be executed. As is hereinafter shown habeas corpus is traditionally, and by earlier decisions of this court, the sole and exclusive remedy to settle the single issue.

"In the opinion prepared by Justice Edmonds it is said that 'Where a prisoner seeks to invoke the statutory remedy provided by section 3701 of the Penal Code, mandate is the only available proceeding. Thus, upon the assumption that any judicial hearing as to sanity must be afforded one under sentence of death, there are two remedies, each directed to an exclusive form of relief. To acquire a simple judicial determination of the fact of sanity, habeas corpus is the proper and exclusive remedy. But to obtain a jury trial of that issue, as provided by section 3701 of the Penal Code, mandate is the only available and adequate remedy.' And that proposition is said to apply here even though defendant has already had the trial as provided for by section 3701. Any one judgment in such a case is said to have no continuing effect because it relates only to sanity as of *its* date and to be immaterial in respect to the claim as of a later date; hence, regardless of the outcome of a first sanity trial under sections 3701 et sequitur the defendant as of a later date may invoke mandamus seeking to compel another trial on the same issue and to the same end. Such a procedure bids fair to be a most useful one for those who would seek unwarranted delays in the execution of death sentences.

"Because of the deplorably confused state in which several important branches of the law (habeas corpus, mandamus, coram nobis, due process, suspension of the death penalty, conflict of laws, trial for insanity of a condemned person, comparative powers of administrative agents and courts, etc.) are left by the present opinion (or lack of one in which a majority of the court agree), read in conjunction with the majority opinion of this court in In re Phyle (1947), supra, 30 Cal.2d 838, 186 P.2d 134, and the opinions of the justices of the United States Supreme Court in Phyle v. Duffy (1948), 334 U.S. 431, 68 S.Ct. 1131 [92 L.Ed. 1494], one who would seek to follow the vagaries of the law through the inconsistencies of this case, with the object of rescuing as much as possible of its integrity, should both concur and dissent.

"I should concur in the judgment denying relief in this proceeding because: 1. mandamus is not a proper remedy; 2. the relief sought by mandamus has already been accorded the petitioner and a valid judgment determining the very issues sought to be litigated is presently outstanding; 3. there is available (and at all times concerned there has been) the plain, direct and simple remedy of habeas corpus, expressly provided by statute to try the only issues which can properly now be raised (Pen.Code, §§ 1473, 1487(5), 1493.) But I should dissent from the judgment because, if the novel suggestion that habeas corpus is not the proper or the exclusive remedy to try the legality of one's imprisonment after sentence (particularly the identity of his jailer, Pen.Code, § 1487(5)) is to be followed, as the opinion of Justice Edmonds suggests, and if mandamus is to be substituted for habeas corpus or added as an additional remedy (not to directly determine the legality of the place of detention or identity of the custodian but to compel a third person administrator to exercise discretion to initiate proceedings to cause a district attorney to start proceedings in a trial court to try anew before a jury as of a new date the question of petitioner's sanity), then it must follow, if we accord any weight at all to the earlier verdict of the jury and outstanding judgment of the superior court, that as a matter of law there is shown 'good reason to believe that a defendant, under judgment of death, has become insane' (Pen.Code, § 3701) and the duty of the warden would appear to require the reinitiation of the roundabout

and cumbersome procedures above mentioned. * * *

"That the above quoted views and holdings of this court are irreconcilably inconsistent with the indicated views of the Supreme Court of the United States is apparent from a reading of Phyle v. Duffy (1948), supra, 334 U.S. 431, 68 S.Ct. 1131 [92 L.Ed. 1494]; such quoted views are likewise, as pointed out in my dissent in In re Phyle (1947), supra, 30 Cal.2d 838, 854, 186 P.2d 134, et seq., squarely contrary to the earlier holdings of this court in Gardner v. Jones (1899), 126 Cal. 614, 615-616, 59 P. 126, and In re Buchanan (1900), 129 Cal. 330, 332-333, 61 P. 1120, 50 L.R.A. 378, with which earlier cases the views of the United States Supreme Court appear to be in full accord.

"The irreconcilable difference between the United States Supreme Court and our majority is pointed up forcefully by Mr. Justice Frankfurter, concurring in Phyle v. Duffy, supra (pages 444-445 of 334 U.S., p. 1131 of 68 S.Ct.): 'The Court now finds that *all that the California Supreme Court did was to hold that as a matter of California procedure* [italics added] the petitioner's claim could not be passed on by the direct remedy of habeas corpus, but that there is available a special local remedy, labeled mandamus, whereby the petitioner can judicially test his present sanity. * * * Whatever may be the elegancies of procedure by which the matter is to be determined, *our decision declining to consider the grave constitutional issues which we thought we had before us, is contingent upon a determination by the Supreme Court of California that the law of that State is what our decision presupposes it to be* [italics added], namely, that California by a remedy which California chooses to call mandamus enables the present petitioner to secure a judicial determination of his present sanity. *This means, of course, not the very restricted scope of relief which is normally associated with the traditional remedy of mandamus.* [Italics added.] It presupposes that California affords petitioner the means of challenging in a substantial way the ex parte finding of the Superintendent of the State Hospital

* * * and enables him to secure judicial determination of the claims he has made in his petition for habeas corpus which, so the court now holds, is not the proper way to proceed.' The majority of this court now cite and rely on the above quoted proposition yet every member of this court knows that no such idea was considered or intended by this court in In re Phyle. This court did not deny habeas corpus on the ground that simply 'as a matter of California procedure' mandamus was the proper—and exclusively the proper —remedy; quite differently, the majority denied habeas corpus solely and exclusively because they intended to hold that the power of the administrative agent was supreme and that petitioner, having been ruled on by the administrative agent, had no right to *any* judicial review. The majority opinion, as already noted, expressly declares (pages 840–841 of 30 Cal.2d, page 136 of 186 P.2d), 'The only question presented is whether a person who has been adjudged insane after conviction * * * has the right to a judicial determination of the question of his restoration to sanity.' Since the question stated was the only question which the majority considered to be properly before them it is not surprising that all the discussion in the opinion is directed to the end of supporting their declared conclusion that a person in the position of defendant-petitioner has no right whatsoever to any judicial process.

"Certain it is that this court did not intend to rule that defendant-petitioner did have a right to judicial review of the administrative agent's ruling and that, having such right, habeas corpus was an improper, and mandamus the only proper, remedy.

"That mandamus is not a proper vehicle here is apparent at once. Mandamus is an extraordinary remedy and 'is to be resorted to only in cases where the usual and ordinary forms of remedy are insufficient to afford redress.' (16 Cal.Jur. 784, § 17.) Habeas Corpus is the usual and ordinary remedy for trying out the legality of the place of one's detention. Our penal code expressly provides for just such situations as that presented here: Section 1473 pro-

vides that 'Every person unlawfully imprisoned or restrained of his liberty, under any pretense whatever, may prosecute a writ of habeas corpus, to inquire into the cause of such imprisonment or restraint'; sections 1486, 1487(5) and 1493 provide that when a person is detained under court commitment but 'When the person having the custody of the prisoner is not the person allowed by law to detain him,' the court shall exercise the writ and 'order such party to be committed to the restraint or custody of such person as is by law entitled thereto.' It is, and consistently has been since his adjudication of insanity, the position of defendant-petitioner that the superintendent of the state hospital, not the warden of the prison, is entitled to his custody. That position is correct so long as defendant remains legally insane and the judgment of the superior court perdures. Whether the final judgment of a court of record continues in effect is a question which a court, rather than a layman, should, in the last analysis, determine. Likewise, if rights (to life or death or to property or liberty) depend on it, a person should certainly be entitled to have a judicial determination as to whether he is *legally* insane. Unless the court determines that fact neither the prisoner nor any court can know by what standard the fact has been determined. Our code provides no standard for determining legal insanity; our courts have set one up for their own proceedings but there is none prescribed for administrative agents. Even if we assume that the hospital superintendent has the power to make a prima facie or preliminary determination of restoration to legal sanity his determination must be subject to judicial review. That much seems clear from the United States Supreme Court's language in Phyle v. Duffy and Ng Fung Ho v. White (1921), 259 U.S. 276, 42 S.Ct. 492, 66 L.Ed. 938. The obvious, the direct and the ordinary method for applying the judicial test in such cases is habeas corpus. * * *

"In the previous application for habeas corpus, the rendition and entry of the judgment, after trial by jury, determining petitioner to be insane were alleged and it was further averred *and not denied* that petitioner was still (as of that date) insane. Unless the so-called ruling of the administrative agent that petitioner had been restored to sanity is, as was then held by the majority, entirely beyond judicial reach, then habeas corpus was and still is the proper, the plain, the direct, and the exclusive remedy. Until In re Phyle that had been the law since Kellogg v. Cochran (1890), 87 Cal. 192, 197, 25 P. 677, 12 L.R. A. 104.

"It is my view that under the circumstances shown here habeas corpus is the only proper and the most desirable remedy. Petitioner has already had the remedy provided by sections 3701 and 3703 of the Penal Code. The warden did believe that petitioner was insane; he acted on that belief; the question of petitioner's sanity was duly brought to trial before a jury; the jury found petitioner to be insane; judgment so decreeing was duly entered; no motion for new trial was made and no appeal was taken; the judgment remains outstanding, fully valid and operative unless petitioner has recovered his sanity. Whether or not he has recovered his *legal* sanity is the decisive question. That is the fact question for judicial determination; upon that fact depends the legal question as to whether petitioner shall be in the custody of the superintendent of the hospital or that of the warden of the prison. Habeas corpus is the established, convenient, available and ordinary remedy to try out both the factual and legal issues.

"On the other hand, if the court is to gore itself on the other horn of its dilemma, then, as heretofore indicated, I think that the original insanity proceedings in themselves (all had 'after * * * [petitioner's] delivery to the warden for execution'), particularly in the light of the solemn judgment based on the jury's verdict, constitute, as a matter of law, 'good reason to believe that a defendant * * * had become insane' 'after his delivery to the warden for execution' and, hence, that if an administrative agent thereupon and thereafter assumes to differ with such judicial determination, one of two things should inevitably follow (at least if his rul-

ing is challenged): Either the judgment should be respected and upheld as against the administrative agent or proceedings should be had in a court of competent jurisdiction to set aside and annul the judgment or to supersede it with one of at least equal and later authority—one which we can know is based on the same standard of legal insanity as was the one to be superseded.

"The judgment that had been entered decreed that petitioner was insane, committed him to the state hospital for the criminal insane, and adjudged that he be *there* confined 'until his reason be restored.' The basic contention of petitioner is that his reason, by legal standards, has not in fact, been restored. If in truth his reason, by such standards, has not been restored the judgment already rendered fully protects him against execution while insane; a new judgment to that effect can add nothing; the new one could be set aside as quickly as the old one; it would have no more prima facie or ultimate value than the old one. There is then no occasion for a new trial under section 3701 et sequitur. But if in truth and upon *legal standards* petitioner has recovered his reason, that fact can easily and promptly be ascertained and determined with legal finality in a habeas corpus proceeding. There is no occasion for inviting the uncertainty, circuity, appeals and other delays attendant upon the added trial court procedure here sought to be innovated.

"For the reasons stated it seems obvious that at this stage of the prosecution of Phyle and under the circumstances which have been enumerated, the application for mandamus is inappropriate. It is inappropriate because the remedy it seeks has already been accorded to Phyle; he has had the jury trial for which provision is made; he has been adjudged insane and the judgment still stands, as fully efficacious—if Phyle remains legally insane—as a new judgment under new proceedings could be. And the simplest and most direct vehicle for determining whether he is still insane by the judicial standard, the only one which avoids appeal by the petitioner, and other indirection and causes of delay, is the ordinary one of habeas corpus.

"The total undesirability of following the newly suggested expedient of substituting mandamus for habeas corpus or of setting it up as an independent and additional procedure (as a method for review of proceedings after trial and judgment of insanity in proceedings pursuant to Penal Code, section 3701 et sequitur) is emphasized by the consideration of what must follow if rationality and consistency are to obtain: If we assume that the remedy petitioner seeks here is a proper one, technically, notwithstanding the outstanding judgment, then it would seem to follow that surely such outstanding judgment must be accorded some weight, some prima facie significance; it should be considered as establishing, as a matter of law, that 'good reason' exists for believing petitioner to be insane. General legal insanity, once adjudicated, is presumed to continue until the contrary is shown. (14 Cal.Jur. 363, § 19; 28 Am.Jur. 751, § 121; In re Estate of Baker (1917), 176 Cal. 430, 436, 168 P. 881.) The judgment, itself, constitutes 'good reason' for believing Phyle to be insane. As emphasized in the opinion of the United States Supreme Court (page 443 of 334 U.S., page 1136 of 68 S.Ct.) it is not the *belief* of the warden nor the *fact* of insanity which must control the right to a *jury trial* of sanity if the procedure under section 3701 et sequitur be available. The court said: 'In considering what the issues may be in a mandamus proceeding, it must be borne in mind that the warden is under a mandatory duty to initiate judicial proceedings, not *when* a defendant is insane, but when "there is *good reason to believe*" he is insane.' (Italics are those of court.) And the 'judicial proceedings' so made available are by the statute expressly and mandatorily made to encompass a jury trial. '[T]he court must at once cause to be summoned and impaneled, from the regular jury list * * * a jury of 12 persons to hear such inquiry.' (Pen.Code, § 3701.) The duty of the warden then would seem obvious: since 'good reason' exists for the belief that petitioner is insane, the warden has no power to try out the ultimate fact; that fact must be determined by a jury. If mandamus be available the warden, under the circumstances shown here, has no discretion to do

otherwise than again initiate the round-about proceedings for another jury trial and judgment which could be, according to the majority, at once set aside by the hospital superintendent. But whether the warden initiates such special proceeding or not the petitioner, by this newly suggested procedure, is given a right to *a hearing of some kind in a trial court,* and, since it is in a trial court, he has a right to appeal in the event of an adverse decision. On the other hand, if we adhere to the traditional and statutory remedy of habeas corpus the procedure is well defined and direct. It affords ample protection and expeditious procedure to both the condemned and to the State. The protection of the State (and of the court) against groundless applications is simple; it is that which we use constantly in other applications of the writ. We require a prima facie showing of evidentiary facts and do not issue the writ on the bald allegation of a conclusion or ultimate fact. By way of example, when application for the writ is made on the ground of denial of due process in that the prosecution has introduced and relied upon per-jured testimony, with knowledge of its falsity, we require more than the conclusionary averment of the asserted ultimate fact; we require a specification of the evidence in detail and of the circumstances showing knowledge of its falsity by the prosecution. A similar prima facie speci-

fication of evidentiary matters should be required in applications for the writ under the circumstances shown here.

"The present case is not controlled by Williams v. Duffy (1948), 32 Cal.2d 578, 197 P.2d 341. In that case the question of the sanity of the prisoner condemned to death was raised for the first time by application for the writ of mandate. There was not there, as there has been here, a trial and an existing, at least prima facia valid, judicial determination that the prisoner was insane. Whether mandamus is, or is not, available as a remedy in an application of first instance as in the Williams case we need not here consider.

"For the reasons above stated I would affirm the judgment solely on the ground that under the circumstances shown mandamus is an inappropriate, and habeas corpus is the only appropriate, remedy; but if the majority are to retroactively, as it were, adopt the suggestion of the attorney general and the assumption of the United States Supreme Court, and now hold that mandamus is an appropriate remedy, whether exclusive or additional, then the judgment should be reversed."

In view of the welter of conflicting legal and factual views generated by the case the Legislature of the State of California in 1949 enacted the amendment to Penal Code Section 3704 [3], providing for a trial

3. "§ 3704. [Proceedings after investigation: Execution of judgment when defendant found sane: Suspension of execution: Recovery of sanity.] If it is found that the defendant is sane, the warden must proceed to execute the judgment as specified in the warrant; if it is found that the defendant is insane, the warden must suspend the execution and transmit a certified copy of the order mentioned in the last section to the Governor, and deliver the defendant, together with a certified copy of such order, to the medical superintendent of the hospital named in such order. When the defendant recovers his sanity, the superintendent of such hospital must certify that fact to the judge of the superior court from which the defendant was committed as insane, who must thereupon fix a date upon which, after ten days' written notice to the defendant and the district attorney of the

county from which the defendant was originally sentenced and the district attorney of the county from which he was committed to the state hospital, a hearing shall be had before said judge sitting without a jury to determine whether or not the defendant has in fact recovered his sanity. If the defendant appears without counsel, the court shall appoint counsel to represent him at said hearing. If the judge should determine that the defendant has recovered his sanity he must certify that fact to the Governor, who must thereupon issue to the warden his warrant appointing a day for the execution of the judgment, and the warden shall thereupon return the defendant to the state prison pending the execution of the judgment. If, however, the judge should determine that the defendant has not recovered his sanity he shall direct the return of the defendant to a state hospital for the in-

and hearing in accord with due process, under the circumstances herein present. Petitioner has never had a hearing under the amendment and asks for one by the instant petition. I am satisfied from an examination of the papers thus far presented to me that he is probably entitled to such hearing. It appears to me that the proceedings surrounding the finding by the Superintendent of the hospital were violative of due process; that Phyle was never accorded a hearing or trial under Section 3701 of the Penal Code; that the proceedings before the Superior Court of Marin County, after the denial of Phyle's application for mandate, were of no curative effect, nor did they comply with due process in the light of the clear pronouncements of the Supreme Court of the United States; that all that was afforded him was the restricted scope of relief normally associated with mandamus proceedings; that under the legislative pattern set forth under Section 3701 he was entitled to try the issues to a jury and he was foreclosed therefrom; that Section 3701 Penal Code cannot be held out to him as a remedy in part and rejected in part; that the procedure employed before the Superior Court of Marin County was merely a judicial gratuity to give some degree of plausibility to the abortive procedure so erroneously invoked.

The ironic feature of Mr. Linn's present arrogance is that it was *his* suggested erroneous procedure born of *his* "spur-of-the-moment" adroitness (34 Cal.2d 144, 171, 208 P.2d 668) which culminated in the procedural merry-go-round, ultimately requiring the legislature of the State of California to amend the law in 1949, Section 3704 Penal Code, in order to give petitioner or one similarly situated the semblance of due process. The said section obviously does not provide for a judicial test of the warden's opinion or mental processes, nor his reasons, if any, as to the present sanity or insanity of Phyle. Rather, it does precisely what Mr. Justice Frankfurter expected the Supreme Court of California to provide under the "suggested Linn procedure" of mandamus—*it tests the findings of the Su-*

*perintendent of the hospital in a Superior Court hearing with all the concomitant elements of due process present.*

In this connection, Mr. Justice Frankfurter said: "Whatever may be the elegancies of procedure by which the matter is to be determined, our decision declining to consider the grave constitutional issues which we thought we had before us, is contingent upon a determination by the Supreme Court of California that the law of that State is what our decision presupposes it to be, namely, that California by a remedy which California chooses to call mandamus enables the present petitioner to secure a judicial determination of his present sanity. This means, of course, not the very restricted scope of relief which is normally associated with the traditional remedy of mandamus. It presupposes that California affords petitioner the means of challenging in a substantial way the ex parte finding of the Superintendent of the State Hospital for the Insane and enables him to secure judicial determination of the claims he has made in his petition for habeas corpus which, so the Court now holds, is not the proper way to proceed." [334 U.S. 431, 68 S.Ct. 1137.]

Section 3704 of the Penal Code as amended meets the requirements of due process and the express mandate of the Supreme Court of the United States. Can it be said, under all the circumstances herein present, that this Court erred in issuing the order to show cause requiring a full and complete exposition of the present posture of the case?

Can it be said that this court's judicial conduct in bringing into play the powers of the Federal Court resulted in a "mockery of justice"? I believe not. It cannot be anticipated at this juncture what, if anything, the return of the Attorney General to the order to show cause may demonstrate. Until that time the Court reserves final judgment herein.

Since dictating the foregoing the Court has been advised that Mr. Justice William O. Douglas, Circuit Justice of the Ninth

sane, to be there kept in safe confinement until his sanity is restored. [Added by Stats.1941, ch. 106, § 15; Am. Stats.1949, ch. 1020, § 1.]"

Circuit, has similarly granted a stay herein.[4]

(San Francisco News—January 19, 1951)

### Phyle Death Stay Assailed

The granting of an eleventh hour stay of execution for William Jerome Phyle, 36 year old San Diego holdup murderer, aroused the anger of a State deputy attorney general yesterday.

Phyle, whose execution had been stayed on eleven previous occasions, was to have died in the San Quentin Prison gas chamber yesterday morning. Late Friday Federal Judge George B. Harris signed a writ of habeas corpus, automatically staying the execution for at least sixty days.

"This is the sort of thing that makes a mockery of justice," declared Deputy Attorney General Clarence Linn in announcing he would appear personally in Judge Harris' court on Monday to argue against the writ.

"Inquiry would have disclosed that on two occasions the Supreme Court of the United States had passed on the matter of Phyle's execution," Linn added. "It would seem that the Supreme Court's decision would be binding upon a lower court."

The writ was granted to enable defense attorneys to determine whether or not Phyle is mentally competent.

Phyle was convicted of first degree murder in the 1945 slaying of a San Diego watchman during the course of a $1.25 holdup.

(San Francisco Examiner—
January 20, 1951)
Killer Phyle Cheats Death For 10th Time
'Mockery Of Justice,' Says State Atty.,
As Reprieve Is Granted
By Al Ostrow

William Jerome Phyle, former paratrooper who killed an elderly night watchman in 1945 and has been fighting ever since to block the state's efforts to execute him, today held a new lease on at least 60 additional days of existence.

He escaped his 10th date with the lethal gas chamber—set for 10 a. m. today—when Federal Judge George B. Harris signed a writ of habeas corpus late yesterday.

Dep. Atty. Gen. Clarence Linn, pointing out that the U. S. and State Supreme Courts had confirmed Phyle's conviction and death sentence, declared "this is the sort of thing that makes a mockery of justice."

"Inquiry would have shown," Mr. Linn said, "that on two occasions the Supreme Court of the United States had passed on the matter. Its decision would seem to be binding upon a lower court."

Mr. Linn, chief criminal appeals deputy for Atty. Gen. Edmund G. (Pat) Brown, said he would appear before Judge Harris personally at 10 a. m. Monday to argue against the writ.

But Judge Harris' signing of the stay of execution—done at the request of Attorney Morris Lavine—will keep Phyle alive for at least two months. Before carrying out the execution, Warden Duffy must now formally request the Superior Court at San Diego, where Phyle killed Watchman Elmer Frazee in the course of a holdup which netted him $1.25, to set a new date with death.

News of the court order reached the slender, jaunty Phyle under dramatic circumstances.

He had already "moved downstairs" from "death row," which is on the top floor of the North Cell Block at San Quentin Prison, to the closely guarded "private room" behind the pea green lethal gas chamber.

His last supper was spread before him—fried chicken, French fries, string beans, lettuce and tomato salad, apple and lemon pie—but Phyle didn't have much appetite. The only thing he had touched was the coffee, when Warden Duffy came in at 6:30 p. m.

---

4. The lengthy statements from the Supreme Court of the State of California, as well as the Supreme Court of the United States, have been made necessary, in my opinion, in order to have a composite in this memorandum of the various views entertained by the members of each court bearing upon the problems herein involved.

"I've got some good news for you," the warden said, and told Phyle that his tenth execution date had been cancelled.

Phyle didn't grin. He said soberly: "Well, I guess this wasn't my time."

Going "back upstairs" to the death house, where there are 21 other condemned convicts, Phyle opined: "I guess I'll have to wait some more and see what happens."

This was a far cry from his previous bold pronouncement that "I tell them I'm crazy, and it's up to them to prove I'm not" * * * "there are no machines to measure sanity" * * * "I intend to continue to exist" * * *

It was the issue of insanity which prompted Judge Harris to sign the life-granting writ. Phyle's attorney raised the point that, in his last appearance before a jury, the defendant had been ruled legally insane. He was sent to Mendocino State Hospital, where he made the mistake of boasting that he had "outsmarted" the psychiatrists by "acting daffy."

Should the hospital superintendent have the power to rule Phyle "restored to sanity" and send him back to San Quentin to be executed? He did.

Since then, state law has been changed, depriving hospital superintendents of this life and death authority in such cases.

Shortly before Judge Harris signed his writ, the State Supreme Court again rejected a similar contention that it would be illegal to execute the 35-year-old son of a Pacific Coast League baseball umpire.